KAREN PALLADINO CICCONE (CA SBN 143432)
**AKERMAN LLP**
725 South Figueroa Street, 38th Floor
Los Angeles, California 90017-5433
Telephone:   (213) 688-9500
Facsimile:    (213) 627-6342
karen.ciccone@akerman.com

CLINT A. CORRIE (*Admitted Pro Hac Vice*)
**AKERMAN LLP**
2001 Ross Avenue, Suite 2550
Dallas, Texas 75201
Telephone: (214) 720-4300
Facsimile: (214) 981-9339
clint.corrie@akerman.com

NEFERTARI  S. RIGSBY (*Admitted Pro Hac Vice*)
**AKERMAN LLP**
One S.E. Third Avenue, Suite 2500
Miami, Florida 33131
Telephone: 305.374.5600
Facsimile: 305.374.5095
nefertari.rigsby@akerman.com

*Attorneys for Defendants*
*The Nick Vertucci Companies, Inc.*
*and Nick Vertucci*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| REAL ESTATE TRAINING INTERNATIONAL, LLC, | Case No. SACV14-00546 AG (DFMx) |
| *Plaintiff/Counter-Defendant,* | **DEFENDANTS' SECOND AMENDED ANSWER, COUNTERCLAIMS** |
| v. | |
| THE NICK VERTUCCI COMPANIES, INC. and NICK VERTUCCI, | |
| *Defendants/Counter-Plaintiffs.* | FACC/Cross-Claim: Sept. 26, 2014<br>Counterclaim:    August 18, 2014<br>SAC:               June 17, 2014<br>FAC:               March 7, 2014<br>Complaint:        January 16, 2014 |
| v. | |
| REAL ESTATE TRAINING INTERNATIONAL, LLC and ARMANDO MONTELONGO, | |
| *Counter-Defendant and Cross-Defendant.* | |

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL.: (213) 688-9500 – FAX: (213) 627-6342

AKERMAN LLP

725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL: (213) 688-9500 – FAX: (213) 627-6342

Defendants The Nick Vertucci Companies, Inc. ("NV Companies") and Nick Vertucci ("Vertucci") (collectively "Defendants") hereby file their Amended Answer to Plaintiff Real Estate Training International, L.L.C.'s ("Plaintiff" or "RETI") Second Amended Complaint and would respectfully show the Court as follows:

## Parties

1.      In response to Paragraph 1 in the Second Amended Complaint, Defendants are without sufficient information to either admit or deny the allegations contained therein and, therefore, deny the same.

2.      Defendants admit the allegations contained in Paragraph 2 of the Second Amended Complaint.

3.      Defendants admit the allegations contained in Paragraph 3 of the Second Amended Complaint.

## Jurisdiction and Venue

4.      In response to Paragraph 4 of the Second Amended Complaint, Defendants do not contest that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332(a).

5.      In response to Paragraph 5 of the Second Amended Complaint, Defendants admit only that the Plaintiff sought an *ex parte* temporary restraining order in the state court filing, which expired before it was ever served.  Defendants deny that they engaged in any "active business misconduct" and that a substantial part of the events or omissions occurred in the Western District of Texas.

6.      In response to Paragraph 6 of the Second Amended Complaint, Defendants admit that there is jurisdiction over Defendants in the State of California. Defendants deny all other allegations contained therein.

**Alleged Facts**

7.    In response to Paragraph 7 of the Second Amended Complaint, Defendants admit that Vertucci was introduced to Armando Montelongo, Jr. ("Montelongo") through a mutual friend, Chris Sanders ("Sanders"), in April 2009. Their business relationship ceased on or about August 28, 2013. Defendants deny all other allegations contained in Paragraph 7 of the Second Amended Complaint as well as the effective date of the Vendor Agreement, attached as Exhibit 1 to the Second Amended Complaint, and assert that the Vendor Agreement was backdated in 2013 to 2010 by Plaintiff and/or Montelongo.

8.    In response to Paragraph 8 of the Second Amended Complaint, Defendants admit that Vertucci traveled to Plaintiff's corporate headquarters located in San Antonio, Texas, but denies that this travel was done on numerous occasions. Further, Defendants deny all remaining allegations contained in Paragraph 8 of the Second Amended Complaint, including those incorporated by reference as outlined in Exhibits 2, 3, 4 and 5.

9.    In response to Paragraph 9 of the Second Amended Complaint, Defendants performed teaching duties for Plaintiff's customers at live seminar events in Texas and other states and, as an independent contractor and vendor, with Plaintiff's knowledge and consent, Defendants appeared at events in the name of his company, The Nick Vertucci Companies, Inc. Defendants acted on behalf of the NV Companies. Defendants deny all remaining allegations contained in Paragraph 9 of the Second Amended Complaint.

10.    In response to Paragraph 10 of the Second Amended Complaint, Defendants deny they are bound by the terms of Exhibit 1, which was fraudulently induced by, and then terminated by Plaintiff.

11.    In response to Paragraph 11 of the Second Amended Complaint, Defendants deny they are bound by the terms of Exhibit 1, which was fraudulently induced by, and then terminated by Plaintiff.

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL: (213) 688-9500 – FAX: (213) 627-6342

1        12.   In response to Paragraph 12 of the Second Amended Complaint,

2    Defendants admit that the business relationship with Plaintiff ended.  However, the

3    business relationship ended on or about August 28, 2013.  Defendants deny the reason

4    for the termination alleged by Plaintiff in Paragraph 12.  Defendants deny that

5    "shortly" after September 11, 2013, they began operating a seminar business through

6    Defendant NV Companies.  Defendants deny all other allegations contained in

7    Paragraph 12 of the Second Amended Complaint.

8        13.   In response to Paragraph 13 of the Second Amended Complaint,

9    Defendants admit that NV Companies provides similar types of goods and services as

10   Plaintiff's business through nationwide seminars and bus tours, including in Texas.

11   Defendants deny there is any agreement, including the Vendor Agreement that

12   prohibits Defendants from having such a competing business.  Defendants deny all

13   other allegations contained in Paragraph 13 of the Second Amended Complaint.

14       14.   In response to Paragraph 14 of the Second Amended Complaint,

15   Defendants deny they have used any confidential and proprietary information owned

16   by Plaintiff.  Defendants admit that they use a cash-flow teaching methodology

17   designed, originated and owned by Defendants in their business, which Defendant

18   Vertucci knew and was teaching before he met Plaintiff or any of its representatives.

19   Defendants deny all other allegations contained in Paragraph 14 of the Second

20   Amended Complaint.

21       15.   Defendants deny the allegations contained in Paragraph 15 of the Second

22   Amended Complaint.

23       16.   Defendants deny the allegations contained in Paragraph 16 of the Second

24   Amended Complaint.

25       17.   In response to Paragraph 17 of the Second Amended Complaint,

26   Defendants admit that they have employed former independent contractors and/or

27   employees of Plaintiffs.  Defendants deny all other allegations contained in Paragraph

28   17 of the Second Amended Complaint.

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL.: (213) 688-9500 – FAX: (213) 627-6342

18.   In response to Paragraph 18 of the Second Amended Complaint, Defendants admit that Keith Yackey works with Defendants, but deny any improper solicitation of him or any other current or former employee or contractor of Plaintiff. Defendants deny all other allegations contained in Paragraph 18 of the Second Amended Complaint.

19.   Defendants deny the allegations contained in Paragraph 19 of the Second Amended Complaint.

20.   In response to Paragraph 20 of the Second Amended Complaint, Defendants admit that they currently work with Erik Slaikeu, Siggi Ahrens and Nicole Marshall. Defendants deny all other allegations contained in Paragraph 20 of the Second Amended Complaint.

21.   Defendants specifically deny that "Plaintiff's ongoing relationship with its clients," . . . "carry with them a high degree of value in goodwill, affirmation of Plaintiff's goods and service, and future business." Defendants deny all other allegations contained in Paragraph 21 of the Second Amended Complaint.

22.   Defendants deny the allegations contained in Paragraph 22 of the Second Amended Complaint. Defendants specifically deny they have caused any loss of revenue for Plaintiff and assert that any losses are due to Plaintiff's own actions or matters beyond Defendants' control.

### Conditions Precedent

23.   In response to Paragraph 23 of the Second Amended Complaint, Defendants deny any "conditions precedent" under the Vendor Agreement have been met by Plaintiff and deny the remainder of the allegations contained therein.

24.   Defendants specifically deny they have received any "cease and desist" letters from Plaintiff, and Defendants deny the allegations contained in Paragraph 24 of the Second Amended Complaint.

### First Claim for Relief
### Breach of Contract
### (Against All Defendants)

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL: (213) 688-9500 – FAX: (213) 627-6342

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL.: (213) 688-9500 – FAX: (213) 627-6342

25.   Defendants refer to and incorporate their Answer and responses to each and every response to the allegations in the foregoing paragraphs, as though fully set forth herein.

26.   Defendants specifically deny that the referenced Vendor Agreement was effective on January 1, 2010, as alleged in Paragraph 26 of the Second Amended Complaint.  Defendants deny the remainder of the allegations in Paragraph 26.

27.   In response to Paragraph 27 of the Second Amended Complaint, Defendants specifically deny that all "teaching methods materials" used are the "sole and exclusive property of Plaintiff."  Defendants specifically deny that Plaintiff ever had a "cash-flow teaching program" prior to 2010. Defendants admit that they use a cash-flow teaching methodology – the same one they had developed and used before they met Plaintiff.  Defendants deny all other allegations contained in Paragraph 27 of the Second Amended Complaint.

28.   In response to Paragraph 28 of the Second Amended Complaint, Defendants admit that they currently work with some former independent contractors and/or employees of Plaintiff, who voluntarily left Plaintiff or were terminated by Plaintiff, including Erik Slaikeu, Siggi Ahrens, Nicole Marshall, and Keith Yackey. Several of them left Plaintiff or were terminated by Plaintiff before Defendants ever started a new business. Defendants deny that anyone was improperly solicited. Defendants assert that no response is required as to what is displayed by Defendants via their social media websites because that information speaks for itself.  Defendants deny all other allegations contained in Paragraph 28 of the Second Amended Complaint.

29.   Because there is no definition of who is a "client," "prospect" or "solicited person," there is no way to respond to the allegations of Paragraph 29 and, therefore, Defendants deny the same.  Defendants deny all the other allegations contained in Paragraph 29 of the Second Amended Complaint.

30.   Defendants deny the allegations contained in Paragraph 30 of the Second Amended Complaint and specifically deny that they have been the cause of any lost revenue to Plaintiff.

**Second Claim for Relief**
**Business Disparagement**
**(Against All Defendants)**

31.   Defendants refer to and incorporate their Answer and responses to each and every response to the allegations in the foregoing paragraphs, as though fully set forth herein.

32.   Defendants deny the allegations contained in Paragraph 32 of the Second Amended Complaint.

33.   Defendants deny the allegations contained in Paragraph 33 of the Second Amended Complaint and specifically deny that Defendants stated they had any affiliation with and/or an endorsement of RETI and its principal, Montelongo.

34.   Defendants deny the allegations contained in Paragraph 34 of the Second Amended Complaint.

35.   Defendants deny the allegations contained in Paragraph 35 of the Second Amended Complaint and specifically deny they have been the cause of any loss of business or reputation to Plaintiff.

36.   Defendants deny all the allegations contained in Paragraph 36 of the Second Amended Complaint.

37.   Defendants deny the allegations contained in Paragraph 37 of the Second Amended Complaint.

**Third Claim for Relief**
**Breach of Fiduciary Duty**
**(Against All Defendants)**

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL.: (213) 688-9500 – FAX (213) 627-6342

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL: (213) 688-9500 – FAX: (213) 627-6342

38.   The Court dismissed the Third Claim for Relief in the Second Amended Complaint with prejudice.  Therefore, Defendants do not respond to the allegations of Paragraphs 38-46 of the Second Amended Complaint.

39.   The Court dismissed the Third Claim for Relief in the Second Amended Complaint with prejudice.  Therefore, Defendants do not respond to the allegations of Paragraphs 38-46 of the Second Amended Complaint.

40.   The Court dismissed the Third Claim for Relief in the Second Amended Complaint with prejudice.  Therefore, Defendants do not respond to the allegations of Paragraphs 38-46 of the Second Amended Complaint.

41.   The Court dismissed the Third Claim for Relief in the Second Amended Complaint with prejudice.  Therefore, Defendants do not respond to the allegations of Paragraphs 38-46 of the Second Amended Complaint.

42.   The Court dismissed the Third Claim for Relief in the Second Amended Complaint with prejudice.  Therefore, Defendants do not respond to the allegations of Paragraphs 38-46 of the Second Amended Complaint.

43.   The Court dismissed the Third Claim for Relief in the Second Amended Complaint with prejudice.  Therefore, Defendants do not respond to the allegations of Paragraphs 38-46 of the Second Amended Complaint.

44.   The Court dismissed the Third Claim for Relief in the Second Amended Complaint with prejudice.  Therefore, Defendants do not respond to the allegations of Paragraphs 38-46 of the Second Amended Complaint.

45.   The Court dismissed the Third Claim for Relief in the Second Amended Complaint with prejudice.  Therefore, Defendants do not respond to the allegations of Paragraphs 38-46 of the Second Amended Complaint.

46.   The Court dismissed the Third Claim for Relief in the Second Amended Complaint with prejudice.  Therefore, Defendants do not respond to the allegations of Paragraphs 38-46 of the Second Amended Complaint.

**Fourth Claim for Relief**
**Fraud**

**(Against All Defendants)**

47.    Defendants refer to and incorporate their Answer and responses to each and every response to the allegations in the foregoing paragraphs, as though fully set forth herein

48.    Defendants deny the allegations contained in Paragraph 48 of the Second Amended Complaint.

49.    The "contract" in question was backdated by Plaintiff for its own purposes.  Therefore, Defendants deny the allegations of Paragraph 49.

50.    Because the allegations in Paragraph 50 of the Second Amended Complaint contain misstatements, false statements, and alleged motives of Defendants, they deny all statements and allegations contained therein.

51.    Because the allegations in Paragraph 51 of the Second Amended Complaint contain misstatements, false statements, and alleged motives of Defendants, they deny all statements and allegations contained therein.

52.    Because the allegations in Paragraph 52 of the Second Amended Complaint contain misstatements, false statements, and alleged motives of Defendants, they deny all statements and allegations contained therein.

53.    Because the allegations in Paragraph 53 of the Second Amended Complaint contain misstatements, false statements, and alleged motives of Defendants, they deny all statements and allegations contained therein.  Defendants specifically deny they were the cause of any losses by Plaintiff.

54.    Because the allegations in Paragraph 54 of the Second Amended Complaint contain misstatements, false statements, and alleged motives of Defendants, they deny all statements and allegations contained therein.

**Fifth Claim for Relief**
**Conversion**
**(Against All Defendants)**

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL.: (213) 688-9500 – FAX: (213) 627-6342

55. Defendants refer to and incorporate their Answer and responses to each and every response to the allegations in the foregoing paragraphs, as though fully set forth herein.

56. Defendants deny all of the statements and allegations contained in Paragraph 56 of the Second Amended Complaint.

57. Defendants deny all of the statements and allegations contained in Paragraph 57 of the Second Amended Complaint.

58. Defendants specifically deny it has "issued multiple cease and desist correspondence demanding cessation of its use of its property"[1] and deny the remainder of the allegations contained in Paragraph 58 of the Second Amended Complaint.

59. Defendants specifically deny they have been the cause of any losses or damages alleged by Plaintiff and deny the remainder of the allegations contained in Paragraph 59 of the Second Amended Complaint.

60. Defendants deny the allegations contained in Paragraph 60 of the Second Amended Complaint.

61. Defendants deny the allegations contained in Paragraph 61 of the Second Amended Complaint.

### Sixth Claim for Relief
### Tortious Interference with Business Relations
### (Against All Defendants)

62. Defendants refer to and incorporate their Answer and responses to each and every response to the allegations in the foregoing paragraphs, as though fully set forth herein.

---

[1] Defendants specifically note that this allegation was never made by the Plaintiff until the Court identified this demand as a necessary element to a conversion claim in its Tentative Ruling adopted on June 4, 2014. [D.E. 46, p. 8].

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL: (213) 688-9500 – FAX: (213) 627-6342

63.   In response to Paragraph 63 of the Second Amended Complaint the allegations of "contract and/or business relations with various business students and/or customers," is so vague that Defendants are without sufficient knowledge or information to either admit or deny these allegations and, therefore, deny them.

64.   In response to Paragraph 64 of the Second Amended Complaint, Defendants currently work with Keith Yackey, Erik Slaikeu, Siggi Ahrens and Nicole Marshall, but Defendants deny all remaining allegations contained in Paragraph 64 of the Second Amended Complaint.

65.   Defendants deny the allegations contained in Paragraph 65 of the Second Amended Complaint.

66.   Defendants deny the allegations contained in Paragraph 66 of the Second Amended Complaint.

67.   Defendants deny the allegations contained in Paragraph 67 of the Second Amended Complaint.

68.   Defendants deny the allegations contained in Paragraph 68 of the Second Amended Complaint.

## Seventh Claim for Relief
### Tortious Interference with Prospective Business Relations
### (Against All Defendants)

69.   Defendants refer to and incorporate through this reference each and every response to the allegations in the foregoing paragraphs, as though fully set forth herein.

70.   Defendants deny the allegations and statements contained in Paragraph 70 of the Second Amended Complaint.

71.   Defendants deny the allegations and statements contained in Paragraph 71 of the Second Amended Complaint.

72.   Defendants deny the allegations and statements contained in Paragraph 72 of the Second Amended Complaint.

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL.: (213) 688-9500 – FAX: (213) 627-6342

73.   Defendants deny the allegations contained in Paragraph 73 of the Second Amended Complaint.

74.   Defendants deny the allegations and statements contained in Paragraph 74 of the Second Amended Complaint.

75.   Defendants deny the allegations contained in Paragraph 75 of the Second Amended Complaint, and specifically deny they caused any loss to Plaintiff.

76.   Defendants deny the allegations contained in Paragraph 76 of the Second Amended Complaint.

<u>**Damages**</u>

77.   Defendants deny that Plaintiff is entitled to any relief outlined in Paragraph 77 and each of its subparagraphs.

a.   Defendants deny that Plaintiff is entitled to actual damages in excess of the minimum jurisdictional amount of this Court;

b.   Defendants deny that Plaintiff is entitled to punitive damages;

c.   Defendants deny that Plaintiff is entitled to incidental damages;

d.   Defendants deny that Plaintiff is entitled to consequential damages;

e.   Defendants deny that Plaintiff is entitled to attorneys' fees;

f.   Defendants deny that Plaintiff is entitled to recover costs of suit;

g.   Defendants deny that they are required to provide an accounting; and

h.   Defendants deny that Plaintiff is entitled to any other and further relief at law or equity in this action.

78.   In response to the "WHEREFORE Paragraph" and "subparagraphs (a)-(j) following Paragraph 77," Defendants deny that Plaintiff is entitled to any such relief that it seeks in this action.

79.   In response to Plaintiff's jury demand, Defendants deny that there are any issues so triable in this case.

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL: (213) 688-9500 – FAX: (213) 627-6342

## Affirmative Defenses

1. Plaintiff's contract with Defendants fails for lack of consideration.

2. Plaintiff's contract fails because conditions precedent have not been met.

3. Plaintiff's claim for damages is barred, in whole or in part, for Plaintiff's failure to mitigate alleged damages.

4. Plaintiff is barred from recovery to the extent that any damage sustained by Plaintiff was the direct and proximate result of the independent, intervening, negligent, and/or unlawful conduct of independent third parties or their agents, including Plaintiff and Plaintiff's agents and principals, and not any act or omission of Defendants.

5. Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands. Plaintiff is making false accusations and unfairly using the legal process to unfairly thwart legal competition.

6. Plaintiff's claims for tortious interference with business relations with "various businesses, students and/or customers" fails as Plaintiff has failed to allege that Defendants actually induced any such business, student or customer to end their alleged business relationship with Plaintiff.

7. Plaintiff's claims for tortious interference with prospective business relations with "various former and/or current clients of RETI" fails as Plaintiff has failed to allege that Defendant actually induced any such former or current client to end their alleged business relationship with Plaintiff.

8. Plaintiff's claims various contract and tort claims fail because Plaintiff cannot show damages proximately caused by Defendants.

9. Plaintiff's claim for breach of contract fails because any non-solicitation and alleged non-competition provisions are void as against public policy under California law.

10. Alternatively, Plaintiff's Vendor Agreement-contract with Defendants fails because any non-solicitation and alleged non-competition provision are

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL: (213) 688-9500 – FAX: (213) 627-6342

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL: (213) 688-9500 – FAX: (213) 627-6342

1  unreasonable  because the Agreement fails to include reasonable limitations as to time,
2  geographical area, and scope of activity.

3      11.    Alternatively, the Agreement fails because it is unenforceable because it is
4  not ancillary to another agreement.

5      12.    Alternatively, the Agreement fails because it imposes a greater restraint
6  than necessary to protect the goodwill or other business interest of Plaintiff.

7      13.    Plaintiff's alleged contract with Defendants is void as it was fraudulently
8  induced under duress and contains false effective dates.

9      14.    Plaintiff owes money or other valuable consideration to Defendants and,
10  therefore, any damages that Plaintiff seeks in this action must be reduced and offset by
11  the amount that Plaintiff owes Defendants.

12      15.    Any statements that Plaintiff alleges Defendants made with regard to
13  Plaintiff's business were based on truth, publically available information  and/or opinio

14      16.    Defendants reserve the right to plead and prove such other affirmative
15  defenses as discovery shows are warranted on the facts of this case.

16
17  Dated: November 14, 2014          AKERMAN LLP

18                                      /s/ Karen P. Ciccone
19                                     Karen Palladino Ciccone
                                       Clint A. Corrie
20                                     Nefertari S. Rigsby
21                                     Attorneys for Defendants
                                       THE NICK VERTUCCI COMPANIES,
22                                     INC. and NICK VERTUCCI

23
24
25
26
27
28

## SECOND AMENDED COUNTERCLAIM-CLAIMS

Defendants/Counter-Plaintiffs    The    Nick    Vertucci    Companies,    Inc. ("NV Companies") and Nick Vertucci ("Vertucci") (collectively "Counter-Plaintiffs") hereby file their Amended Counterclaim and Cross-Claim complaining of Counter-Defendant Real Estate Training International, LLC ("RETI") and its Principal Armando    Montelongo,    Jr.    ("Montelongo"),    the    Cross-Defendant,    and    would respectfully show the Court as follows:

### Parties

1.    The Nick Vertucci Companies, Inc. ("NV Companies") is a Nevada corporation, with its principal place of business located in California.

2.    Vertucci is an individual residing in the State of California, at 1015 E. Chapman Avenue, Orange, California 92869.

3.    Real Estate Training International, LLC ("RETI") is Delaware limited liability company, with its principal place of business in San Antonio, Texas, who has appeared in the above suit by and through its counsel of record, and may be served with process by serving its counsel of record, Jeffrey D. Cawdry and Kimberly D. Howell at 633 W. Fifth Street, 52nd Floor, Los Angeles, California 90071.  RETI is registered to do business with the California Secretary of State as Entity Number 20100810033, and its agent for service of process in California is CT Corporation System (C0165406) as of March 24, 2010.

4.    Montelongo, the principal of RETI, is an individual residing in the State of Texas and may be served with process at his place of business located at 2935 Thousand Oaks Drive, #6-285, San Antonio, Texas 78247.  Montelongo also has a residence in California at 2310 West Oceanfront, Newport Beach, CA  92663.

5.    Vertucci and the NV Companies assert counterclaims pursuant to Fed. R. Civ. P. 13(a), or alternatively pursuant to Fed. R. Civ. P. 13(b), against RETI and Montelongo.

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL: (213) 688-9500 – FAX: (213) 627-6342

6. Montelongo is an indispensable party to this action pursuant to Fed. R. Civ. P. 13(h) and 19(a)(1)(A). Alternatively, Montelongo is a proper party to this action pursuant to Fed. R. Civ. P. 20.

7. Based upon information and belief, Montelongo has used RETI as his the alter ego because he owns 100% of RETI, controls RETI and has used RETI to commit tortious acts. Permitting such use of the corporation would promote injustice if Counter-Plaintiffs are left with only a judgment as to RETI for conduct committed by Montelongo.

## Venue

8. Counter-Plaintiffs assert these counterclaims pursuant to Fed. R. Civ. P. 13(a) or, alternatively, 13(b).

9. Venue is proper in this district under 28 U.S.C. §1391(a)(2) because it was transferred to this District from the Western District of Texas. Furthermore, venue is proper in this district under 28 U.S.C. §1391(b)(3).

## Background
### *VERTUCCI'S EXPERIENCE*

10. Vertucci obtained experience in the real estate business through the James Smith Investing company, a part of the National Real Estate Institute ("NREI") program. Vertucci met Erik Slaikeu ("Slaikeu") and Chris Sanders ("Sanders") through the NREI, and the three became friends. Slaikeu began working for Robert Allen Seminars and recruited Vertucci to come there. Through Robert Allen, Vertucci obtained experience speaking about and selling real estate.

11. Robert Allen ("Allen"), through Robert Allen Seminars, one of the pioneer companies in how to buy real estate with little to no money down, developed a simple formula to make money from real estate by (1) buying distressed properties, (2) spending minimal amounts in financing and fix up costs, and (3) selling the revitalized properties for a higher price. This system was started through Allen's books, and

SECOND AMENDED ANSWER COUNTERCLAIMS

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL: (213) 688-9500 – FAX: (213) 627-6342

seminars in the late 1970s, and continued by dozens of other imitators since then, including Donald Trump, Carlton Sheets, Bill Vaughn, and Tom Vu, and many other imitators who have followed, using free real estate training seminars to introduce students to their teaching methods and courses.

12.     Vertucci, a former student and, later, a speaker with Robert Allen Seminars, had a long-established, successful business model teaching and working with cash-flow generating properties. Vertucci's model involved forging relationships in locations where distressed or undervalued properties were located, identify and work with an on-the-ground person or persons who could assist in the buying, overseeing, rehabbing, renting, and managing the real estate properties. Vertucci would invest his own money, as well as help raise money for the property purchases and rehab expenses, and would also conduct the public speaking, training, selling, advising and counseling to prospective purchasers of the properties, and assist buyers in closing transactions.  Vertucci and his staff provided consultation and advice to people who were trying to purchase cash-flow properties. Vertucci also trained the on-the-ground people who rehabbed and managed the cash-flow properties and their respective staff and management company on how to provide the services to the properties.

13.     Operating from his home base in California, and through his radio show in California where he would discuss his techniques for purchasing cash-flow properties, Vertucci was actively engaged in teaching people how to purchase cash-flow properties.  If a radio show listener wanted to purchase a cash-flow property and called in, Vertucci would work with them to facilitate a sale of cash-flow property for them and earn a consulting fee from the sale when the sale was concluded.  Vertucci created this business plan, model, and training system, long before he met Montelongo.

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL: (213) 688-9500 – FAX: (213) 627-6342

*BUSINESS RELATIONSHIP BETWEEN VERTUCCI AND*

*MONTELONGO*

14.    Montelongo's company, RETI, which also does business under names such as "Armando Montelongo Seminars," "AMS," or "Education Management Services, LLC" travels the same well-worn business path as its predecessors, in a business where there are very few secrets. Montelongo operated under different names, and other companies as set forth above. Upon information and belief, Montelongo owns 100% of the stock of RETI and other AMS-brand companies.

15.    Upon information and belief, Montelongo, as the 100% stock owner and principal of RETI, uses the corporation to commit various tortious acts and to conduct by utilizing the funds personally.

16.    Montelongo's "students" at his free introductory seminars were not "customers" *per se*, in that they paid nothing to attend the initial introductory seminar. They were random people who responded to internet, TV and radio ads that RETI or AMS periodically ran to solicit people to attend a free seminar. Once they attended a free seminar, however, RETI and their staff would then try and sell them on other seminars and courses for which the attendees would have to pay money.

17.    In or about April 2009, Vertucci was introduced to Montelongo by mutual friend, Sanders.  Before he met Vertucci, Montelongo was conducting business in California by soliciting California customers for his bus tours.  After the introduction by Sanders, Montelongo and Vertucci became friends and business colleagues.  Vertucci was selling and advising on how to purchase professionally-managed, cash-flow properties from his home base in Orange County, California. Vertucci had a radio call-in show in Southern California, addressing purchasing cash-flow properties.  Vertucci was also personally engaged in purchasing and owning such properties for his own portfolio.  His then portfolio of properties included properties in

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL: (213) 688-9500 – FAX: (213) 627-6342

Indianapolis, Indiana.  Sanders thought that Montelongo and Vertucci should meet since they were in similar, but different aspects of, the real estate seminar training and counseling business, and Montelongo was marketing to, and conducting his seminars in California, to California residents.

18.    On a bus tour, Montelongo would rent a large bus, charge his students a set price for the bus tour, bring various speakers to talk about various aspects of purchasing real estate, and take the group of attendees to look at various distressed properties in California.  But he was not selling those properties because he did not have a business model or personnel to do that.  His bus tours started in California in 2009 and continue through the present.  In order to notify California-based customers about his bus tours, Montelongo would purchase radio and TV ads and run other media ads in California to solicit California residents in advance of the bus tours.

19.    When Vertucci met Montelongo, Montelongo was only speaking about, or teaching, about purchasing and selling residential properties – not purchasing and selling cash-flow generating properties.  Montelongo was not selling real estate; he was just selling training services in how to purchase real estate with little to no money down.  At Vertucci's suggestion, Montelongo began offering mentorships through his seminars, whereby students would have to pay a set fee for a more intense training program.

20.    In 2009, Montelongo and Vertucci met several times in California to discuss doing business together.  Montelongo stayed at Vertucci's home in Orange, California.  Montelongo invited Vertucci to become a speaker at Montelongo-sponsored seminars on how to purchase cash-flow generating properties, an area of special focus for Vertucci, and an area of the business in which RETI and AMS did not have any prior experience.  Vertucci agreed, and was paid a fee to speak about cash-flow properties at RETI-sponsored events.  Vertucci and his company, the NV Companies, were operating only as consultants to AMS, without any kind of formal

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL: (213) 688-9500 – FAX: (213) 627-6342

agreement.  Vertucci never took an oath of loyalty to RETI and, indeed, operated with full knowledge and approval of RETI and Montelongo under the name of the "NV Companies" while working with AMS and Montelongo.  Vertucci did not speak at every AMS event, which were held in different states, including California, because he had his own business interests in California and his radio show.  But for the RETI/AMS events where Vertucci did speak, Vertucci was paid by RETI for his speaking fees.  He also provided all materials to students who attended.

21.     Vertucci had other ongoing projects and investment opportunities in California and, therefore, he needed an agreement with Montelongo to compensate him for his services if he was going to invest a substantial amount of his time with RETI in speaking and training engagements, sales of his properties, and give up other opportunities.  Vertucci had already developed and designed Montelongo's RETI cash-flow event – a three-day event which Montelongo did not previously offer. Montelongo charged students $10,000 for the purchase price for that event called the "Diamond Package."  The cash-flow generating property training was fulfilled by Vertucci and his staff.  Vertucci and Montelongo formed an agreement regarding Vertucci's speaking and training fees for cash-flow events.  Under their agreements, Vertucci and Montelongo agreed that Vertucci would receive $1,000 per "BU" or buying unit (a term that referred to a student who paid for a cash-flow seminar on the bus tour) from the $10,000 purchase price Montelongo charged students for such cash-flow event seminar.  The $1,000 per BU was paid to Vertucci just to teach the course, and had nothing to do with the design and development of the course and materials or selling of any of the properties under the NV Properties banner.  For example, if Vertucci taught the cash-flow event at an AMS event and had fifty (50) "BUs" attend, Vertucci would be paid $50,000 to teach at that event by RETI. RETI would receive $500,000 less the $50,000 paid to Vertucci.

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL.: (213) 688-9500 – FAX: (213) 627-6342

*VERTUCCI'S SEPARATE JOINT VENTURES*

22.    Around the same time that Vertucci began providing services to RETI, Vertucci had another valuable asset Montelongo was interested in – Vertucci owned or controlled a number of cash-flowing properties in his own portfolio that could be sold.  The initial group of properties he owned or controlled was located in Indianapolis, Indiana.  Vertucci's on-the-ground manager at that time was Aaron Adams ("Adams").  On many of the properties, Vertucci had invested his own money to purchase, rehab, and prepare to sell the rehabbed properties.  For some properties that Vertucci did not own, Vertucci was appointed the selling agent by the owners to sell these properties.  By having Vertucci bring his portfolio properties for sale to RETI and Montelongo's seminars and make them available to students attending RETI/Montelongo's seminars, Montelongo saw a way that he could claim a fee from Vertucci's sale of these properties to any RETI student, without doing any additional work or incurring additional costs.  Sanders also wanted a cut of sales because he introduced Montelongo to Vertucci.

23.    In the four and a half years Vertucci and NV Companies worked with Montelongo through RETI, RETI conducted dozens of seminars.  At these seminars, Vertucci was allowed to set up a booth under the name of "NV Companies," and offer his cash-flow portfolio properties for sale.  These property sales were successful from 2009-2012, but as the properties sold, the inventory of properties to sell needed to be replenished by acquiring new properties.

24.    In 2012, Vertucci decided to purchase distressed cash-flowing properties in the Las Vegas market.  Vertucci's role was to acquire, control, rehab, refurbish, and rent and improve their cash flow through rentals and better financial controls, and then to provide access to those properties to RETI students.

25.    With this move into the Las Vegas market, Vertucci recruited Giovanni Fernandez ("Fernandez") as his "on-the-ground" contact to help with the real estate handling issues.  Fernandez had a background in owning and managing real

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL: (213) 688-9500 – FAX: (213) 627-6342

estate property.  At that time, Fernandez was working as a field mentor and subcontractor to RETI conducting one-on-one trainings. Through conversations with Fernandez, Vertucci understood he had a good background on the basics of buying, rehabbing and management of real estate.  Vertucci told Montelongo that he wanted to recruit Fernandez to help him with Vertucci's NV Properties sales.  Montelongo did not object to Fernandez working with Vertucci.  Fernandez already had real estate expertise, but Vertucci taught Fernandez the implementation process of how his business model worked to cash-flow properties and how to work within a seminar business environment.  Vertucci and his staff provided the inventory and closing documents for purchasers and documents to raise new funds to purchase new properties.

26.    Vertucci and Fernandez kept separate corporations, but Vertucci developed a joint venture with Fernandez.  Fernandez changed his own logo to Vertucci's logo ("NV") for management of the Vertucci-Fernandez properties and called his company, "NV Acquisitions," in order to appear consolidated with Vertucci's "NV Properties" for sales comfort of the RETI students' prospective purchasers.[2]  Vertucci did business under "The Nick Vertucci Companies, Inc.," with an "NV" logo.  In this joint venture, Vertucci and Fernandez (1) received or had a right to a share of profits of the business, (2) expressed an interest in becoming partners in the business, (3) participated or had a right to participate in the control of the business, and (4) shared or agreed to share expenses and losses of the business and liabilities to third parties.[3]  Fernandez referred to Vertucci as his "partner."  Fernandez was so thankful to Vertucci to be brought into the partnership that he and his wife,

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL: (213) 688-9500 – FAX: (213) 627-6342

---

[2]  Based in Orlando, Florida, Fernandez also operated a company called "NV Florida Real Estate Management."

[3]  The Nick Vertucci Property Management Company ("NV Property Management") managed the properties in Las Vegas, Nevada and Orlando, Florida.

Elise Sabatino ("Sabatino"), gave Vertucci a Florida property[4] as a gift of appreciation.

27.     As evidence of the joint venture, Vertucci and Fernandez created a business plan to pursue the goals of the joint venture. (*See* Ex. A).  While Vertucci funded the acquisition of many of the properties himself, as demand for the properties increased, the joint venture had to raise new money in order to fund the purchase and rehabbing expenses of new properties.  The JV had two (2) programs whereby individuals, who wanted to participate in the acquisition and sale, could invest in a specific property or properties or they could loan money to the Vertucci-Fernandez venture to purchase and rehab properties and receive their principal, plus an agreed amount of interest when the property was sold.  (*See* Ex. A).

28.     All of the NV Properties, whether in Indianapolis, California, Las Vegas or later, Florida, were sold under the "NV Companies" logos and banners at the events, even to the students from Montelongo's seminars.

## *MONTELONGO RECEIVED PAYMENTS FROM*
## *NV PROPERTY SALES*

29.     In late 2009 and early 2010, Montelongo sent one of his lawyers to speak to Vertucci in detail about his property sales program.  While, ostensibly there on behalf of Montelongo, Vertucci was encouraged to be forthright and open about how his program worked, to provide detailed mechanics of the transactions and to provide all the documentation for his review.  Believing the lawyer was helping him also, because Vertucci was in a business relationship with Montelongo and RETI, Vertucci had several lengthy meetings with Montelongo's lawyer in which he revealed otherwise confidential details of the business and how it worked, seeking the lawyer's advice.

---

[4] The address for the home is 818 Halstead in Orlando, Florida.

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL: (213) 688-9500 – FAX: (213) 627-6342

30.     These properties were performing assets, and Montelongo wanted to obtain some money from the Vertucci-Fernandez joint venture.  Initially, Montelongo did not use his own money to purchase those properties to be resold to his students.[5] Understanding that this joint venture was profitable, Montelongo undertook the role of providing access to students attending his paid seminars and encouraging them to view the NV Properties and to purchase these properties.

31.     As he preferred his students not know he was benefitting from the sale of these properties, Montelongo asked that Vertucci submit and/or wire the payments to a corporate account for or on behalf of RETI.  Based on information and belief, the money obtained from the sale of the NV Properties was  used personally by Montelongo, and not on behalf of RETI.

32.     Regarding property sales from the NV Properties portfolio (the purchase, rehabbing and rented properties), as the cash-flow expert and the front-end salesperson, Vertucci would collect $5,000 up front from a purchaser to lock up the property for that purchaser.  Vertucci, Fernandez, Montelongo and Sanders would all receive a portion of the profit from each sale and the properties would be marked-up when sold to accommodate the fee structure.  When the property was actually sold, Vertucci would receive an additional of $13,000 (total $18,000), and Fernandez would receive $5,000.  From the $18,000 Vertucci received, he would wire Montelongo's company $6,500 of the $18,000, $500 would go to Sanders, and Vertucci would retain the remaining $11,000.  Montelongo did not want money wired directly to his personal account so it would not appear that Montelongo was directly benefitting from introducing his students to purchase NV Companies cash-flow properties from Vertucci.  Regardless, monies were wired to his RETI account, the company of which Montelongo owned and controlled through his 100% stock ownership.

---

[5] Montelongo later became a lender himself when he realized he could make a guaranteed 15% return on a short term loan.

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL: (213) 688-9500 – FAX: (213) 627-6342

*CHANGES IN 2012*

33.     In or about June 2012, when Montelongo's real estate seminar business began losing money, Montelongo had a sudden change of heart about Vertucci's speaking fees.  He unilaterally breached his agreement to pay Vertucci the "$1,000 per BU" for speaking at cash-flow events.  Vertucci protested, and Montelongo reminded him of the money he was receiving from the joint venture as a result of having access to RETI's clients.  Based solely on the personal assurances from Montelongo that he would not interfere with the joint venture agreement between Vertucci and Fernandez, Vertucci agreed to continue working as a speaker at cash-flow events that Vertucci had created for RETI and AMS.  Nevertheless, the breach of the agreement to pay Vertucci compensation per BU caused Vertucci a significant loss of income.

34.     Vertucci personally raised 50% to 85% of all the money that was used to purchase, rehab, and manage the NV Properties' inventory properties through separate joint venture agreements with investors/lenders who wanted to loan money to purchase and rehab properties in exchange for a guaranteed return on their loan. Vertucci personally guaranteed the return of their invested funds, plus interest.

35.     Fernandez personally disliked Montelongo and knew Montelongo was receiving a sizable payment from the NV Properties' sales for little to no effort. Accordingly, Vertucci had to act as a buffer between Fernandez and Montelongo to keep tempers from flaring between them.  Fernandez and Montelongo rarely spoke.

**THE FORBES EXPOSURE, THE BACKDATED VENDOR AGREEMENT, AND TERMINATION IN 2013**

36.     In the summer of 2013, Montelongo invited a writer from Forbes Magazine who wanted to write an article about Montelongo's business to come to Riverside, California, to an auditorium.  Montelongo thought the article would be

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL: (213) 688-9500 – FAX: (213) 627-6342

favorable and help his business. It was not. In June, the resulting <u>Forbes</u> article, entitled "Meet Armando Montelongo: The Home-Flipping Huckster Who'll Make $50M This Year" by Abram Brown, was very negative about Montelongo's business practices and motivations. Calling him a "huckster," Brown described Montelongo's "secret formula:  Go deeply into debt to buy distressed properties, fix them up minimally, and sell them quickly"; calling into question the value of what he was orally promising, and the value of what he was delivering to paying students and noting that, under the guise of providing real estate training, his company targeted getting money from unemployed and economically desperate people.  The article hit the internet and went viral.  The article described various complaints against Montelongo by former "customers" and consumers with the Texas Attorney General's office and the Better Business Bureau in Texas.  Montelongo's business/brand, AMS and RETI, started to suffer because of this negative publicity broadcast over the internet and accessible to RETI prospective students. Montelongo's sales numbers started declining quickly.  Montelongo was looking for ways to raise or maintain revenues.

37.    On July 9, 2013, as Vertucci was about to attend a bus tour in California, a lawyer for Montelongo, Andy Moon ("Moon"), presented Vertucci with a "Vendor Agreement."  Moon told Vertucci it was non-negotiable and, if he did not sign it, he could not go on the bus tour and his relationship with RETI would be terminated immediately.  Among other items, the Vendor Agreement contained language claiming that all information Vertucci had received was "confidential" and that Vertucci would be prohibited for a period of twenty-four (24) months after termination of his relationship from soliciting customers or employees of RETI or doing business with them or using any "Confidential Information."  RETI offered Vertucci no compensation for signing the agreement, and there were no beneficial clauses in the agreement for Vertucci – only the threat of termination if he did not sign.  They allowed him no time to review it with his counsel.  Vertucci protested

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL.: (213) 688-9500 – FAX: (213) 627-6342

signing the agreement and sent Moon an email noting that the Vendor Agreement was backdated to January 2010, and was therefore false, and he did not want to sign it. (Ex. B). Montelongo reminded Vertucci that he could still make money through the NV Property joint venture sales as a result of having access to the RETI clients. As the bus tour was an important source of business for Vertucci and Fernandez, and as NV Properties had a number of property sales and acquisitions underway in various stages of development, and millions of dollars invested in and loaned on various real estate properties, Vertucci's inability to sell the NV Properties could substantially interfere with Vertucci's joint venture obligations to Fernandez and to their investor/lenders if terminated abruptly. Therefore, Vertucci documented he was signing the Vendor Agreement under protest and duress, and noting the backdating issue. (*See* Ex. B).

38.    The Vertucci-Fernandez joint venture contained millions of dollars of property inventory. If Vertucci refused to sign the Vendor Agreement and his relationship terminated immediately, he would have been stuck with a real estate portfolio of properties in which he not only had a substantial amount of his own money invested, but also funds of other lenders for whom he had personally guaranteed the return of their investment, plus their interest, and no platform to sell the properties. RETI and AMS knew this because Montelongo was a beneficiary of these sales through the separate payments that Montelongo was receiving, and he knew that Vertucci would have little, to no choice, but to sign the Vendor Agreement if Vertucci wanted to continue. Vertucci did not know this was the beginning of Montelongo's strategy to terminate him and grab the NV Properties' business for himself.

39.    Almost immediately after the Vendor Agreement was signed under protest and duress, Montelongo began distancing himself from Vertucci. At one point, Montelongo ceased speaking to Vertucci. Montelongo started warming up to and courting Fernandez on the idea of going behind Vertucci's back to effectively cut Vertucci out of the Vertucci-Fernandez NV Properties real estate property sales joint

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL.: (213) 688-9500 – FAX: (213) 627-6342

venture agreement. Montelongo eventually approached Fernandez and his wife, Elise Sabatino at Vertucci's very last bus tour and told them that he (Montelongo) was cutting ties with Vertucci, and they had two choices: (1) Montelongo would bring the NV Properties business in-house and do it himself, including properties in which Vertucci had his own money invested, while keeping all the profits from properties' sales himself; or (2) Fernandez could make $6,000 per property instead of $5,000 per property and stay onboard and work with Montelongo as his joint venture partner. Regardless, Montelongo made clear to Fernandez, that he (Fernandez) could not do any more business with Vertucci, and Fernandez must breach his joint venture agreement with Vertucci.

40.     Montelongo made other promises to Fernandez regarding protecting Fernandez's interests, and threatened suit if he did any business with Vertucci, inside or outside of RETI.

41.     Montelongo also told Fernandez and his wife that they could not work with Vertucci, even on other properties Vertucci had outside of the NV Properties joint venture they were offering to Montelongo's students. Fernandez capitulated to Montelongo's demands and effectively breached/quit the Vertucci-Fernandez joint venture. As a result, Vertucci no longer had an immediate "on-the-ground" person with which to pursue acquiring properties, managing construction and remodeling crews, developing, rehabbing, and reselling the cash-flow properties. Vertucci had to discontinue his radio show since he could not prospect for, purchase, rehab, manage on the ground and rent properties, and also be in California to conduct a radio show. Having devoted four and a half years of his life to working with RETI, Vertucci returned home, to California fulltime, not sure of his future prospects.

42.     In sum, Fernandez was forced, by Montelongo's unlawful interference, to cut all ties with Vertucci. Montelongo interfered with a business and contractual relationship that Vertucci spent several years building with Fernandez.

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL: (213) 688-9500 – FAX: (213) 627-6342

43. Having previously obtained Vertucci's signature on the unenforceable backdated Vendor Agreement, on or about August 28, 2013 RETI, and Montelongo terminated their relationship with Vertucci.

44. Montelongo knew that his interference in the joint venture between Fernandez and Vertucci would not only impact their immediate ability to conduct business, but would also substantially harm Vertucci's long-term business model and Vertucci's ability to sell Vertucci properties sold outside of those offered through the Vertucci-Fernandez NV Properties joint venture. And, to make sure he harmed Vertucci, Montelongo threatened Fernandez if he did any business with Vertucci, even outside of RETI, Fernandez would be terminated, and Montelongo would take control of the NV Properties business. Montelongo told several people he intended to financially destroy Vertucci so Vertucci could never compete with him and posted insulting remarks on Facebook and other social media to show he had destroyed Vertucci. Montelongo insulted Vertucci to other AMS employees and independent contractors through PowerPoint slides and derogatory comments at company seminars and other events.

45. Under the existing Vertucci-Fernandez joint venture, where Vertucci had invested his own funds, or for which he had raised the money from other lenders to purchase and rehab the properties, Vertucci was owed over $1 million on those properties and guaranteed investor/lender money. Montelongo threatened Fernandez not to release the money that was owed to Vertucci under the Vertucci-Fernandez joint venture agreement already agreed to by Fernandez. At Montelongo's insistence and with his interference and threats, Fernandez held Vertucci's invested money and the profits from the sale of NV Properties hostage for over six (6) months – refusing to release the money owed to Vertucci while Montelongo, through his lawyers, tried to get Vertucci to sign a release of liability. In that proposed settlement, Montelongo acknowledged the existence and validity of the joint venture between Fernandez and Vertucci.

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL.: (213) 688-9500 – FAX: (213) 627-6342

46.     All of this action caused substantial financial harm to Vertucci in various ways:

47.     By virtue of Montelongo's wrongful action in breaching his agreement to pay Vertucci for the $1,000 per BU for Vertucci seminar training fees, Vertucci has lost $1,000 per BU for over two years from the cash-flow events.  These losses can calculated by obtaining record of attendees at the cash-flow events from Montelongo/RETI.

48.     In the four and half years prior to their business relationship being terminated by Montelongo, Vertucci, Aaron Adams and later Vertucci and Fernandez sold between 1,500-2,000 properties from Indianapolis to Orlando, Florida, to Las Vegas, Nevada.

49.     Vertucci had two kinds of interests in properties in the NV Properties portfolio.  First, Vertucci had his own money invested to purchase specific properties.  On those, where he was both the lender/investor and purchaser, he was entitled to a return of his principal investment, plus 15% return on the sales price as interest on his loan, plus his $11,000 earned from the joint venture splits when the properties sold.  On other properties where he raised the money from other investors/lenders, which he personally guaranteed, he was entitled to $11,000 from the sales proceeds but he was personally was obligated, through personal guarantees, to make sure the lenders/investors' received back their principal loan, plus the agreed interest rate.

50.     By holding Vertucci's money and properties hostage for over six (6) months, RETI and Montelongo required Vertucci to spend thousands of dollars in legal fees fighting with Montelongo to get Vertucci's own money back from the escrow accounts.  Vertucci, ultimately, did not sign a release of liability.  Accordingly, Montelongo brought this suit against him in state court alleging violations of the back-dated, half-baked Vendor Agreement not otherwise supported by consideration.

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL: (213) 688-9500 – FAX: (213) 627-6342

51.     There were at least 80-100 properties in Vertucci's NV Properties' real estate property inventory with Fernandez at the time of Montelongo's wrongful interference with Vertucci's agreement with Fernandez.  By agreement, Vertucci was owed $11,000 on the sale of each property.  As a result of losing this revenue stream, it is estimated that Vertucci has lost between $880,000 to $1.1 million regarding payments owed to him for those properties.

52.     In addition, because of Montelongo's interference with Vertucci's NV Properties agreements with Fernandez, and Montelongo's insistence that Fernandez could not work with Vertucci at all, and Montelongo's interference. Vertucci's with his relationship with Fernandez involving non-NV Properties sales, under which Fernandez worked separately with Vertucci, Vertucci no longer could sell properties via his radio show, because in order for the business model to work, Vertucci needed an experienced person in the locale of the properties to perform the on-the-ground work such as acquiring, rehabbing, renting and assisting in sales of the properties.  In the past, before he began working with RETI, Vertucci had made steady sales of properties through his radio show of at least $300,000-$500,000 per year. Montelongo's threats against Fernandez to terminate their relationship altogether, caused Vertucci to cancel the radio show and lose this avenue of income from those sales.

### Count I – Tortious Interference with Contract
### Counterclaim against Montelongo

53.     Counter-Plaintiffs hereby incorporate the statements and/or allegations contained in the foregoing paragraphs, as if fully set forth herein.

54.     There was a joint venture agreement between Fernandez and Sabatino, d/b/a NV Acquisition Management, LLC, on the one hand, and Vertucci and The Nick Vertucci Companies, Inc., on the other hand.

55.     The agreement was a joint venture agreement involving the acquisition, purchase, rehabbing, maintenance, management, rental, and sale of cash-

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL: (213) 688-9500 – FAX: (213) 627-6342

flow generating properties and the splitting of fees, expenses, and profits and losses from the sale of the NV Properties portfolio: The joint venture agreement was recognized and affirmed, even after the agreement was breached. (*See* Ex. A).

56.    The parties honored the terms of the joint venture agreement until Montelongo, individually and/or using RETI as his alter ego, willfully and intentionally interfered with the agreement by threatening Fernandez with termination and assuming control of all the NV Properties if Fernandez did not agree to breach the agreement and "cut all ties" with Vertucci. Montelongo did this so he could receive greater profits from the NV Properties' portfolio sales than he was receiving, instead of Vertucci. Montelongo willfully and intentionally threatened to sue Fernandez and his wife, Sabatino, if they did not agree to sever all ties with Vertucci.

57.    Montelongo's interference was intentional and wrongful.

58.    Montelongo wrongfully interfered with Fernandez and Sabatino's joint venture agreement with Vertucci and caused them to breach their agreements with Vertucci.

59.    In doing so, Montelongo has proximately caused a loss of income to Vertucci in an amount not less than $1.1 million.

## Count II – Tortious Interference with Business Relationship
### Counterclaim against Montelongo

60.    Counter-Plaintiffs hereby incorporate the statements and/or allegations contained in the foregoing paragraphs, as if fully set forth herein.

61.    There was a valid joint venture agreement and business relationship between Fernandez and Sabatino, d/b/a NV Acquisition Management, L.L.C., and Vertucci and the NV Companies.

62.    The agreement was a joint venture agreement involving the purchase, rehabbing, maintenance, and sale of properties and the splitting of fees, expenses, and profits from the sale of the NV Properties. The agreement was recognized and affirmed, even after the agreement was breached. *See* Exhibit A.

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL.: (213) 688-9500 – FAX: (213) 627-6342

63.     In the event the Court concludes that the joint venture agreement does not constitute a contract, regardless of the nature of the agreement, Vertucci and Fernandez had an established an ongoing and active business relationship. Montelongo was not an active participant in the business relationship; he merely received payments.

64.     The parties to the business relationship honored the terms of their agreements regarding the relationship  until Montelongo, individually and/or using RETI as his alter ego, wrongfully interfered with the Counter-Plaintiffs' agreements with Fernandez by threatening Fernandez and Sabatino with termination and taking control of all NV Properties if Fernandez and Sabatino did not agree to "cut ties" with Vertucci, breach their agreement, and sever their business relationship with Vertucci. Montelongo did this so he could receive more money from the property sales of the NV Properties' portfolio that he was receiving at the expense of Vertucci. Montelongo wrongfully threatened Fernandez and his wife with suit if they did not agree.  Montelongo also induced Fernandez to breach his agreements with Vertucci by offering him a larger payout than he was receiving with Vertucci, if Fernandez complied with Montelongo's demands.

65.     Montelongo's interference was intentional and wrongful.

66.     Montelongo wrongfully induced Fernandez and Sabatino to sever their business relationship with Vertucci and intentionally interfered with Fernandez and Sabatino's performance of their business relationship with Vertucci.

67.     In doing so, Montelongo has proximately caused a loss of income to Counter-Plaintiffs resulting in losses not less than $1.1 million.

## Count III – Breach of Oral Contract
### Counterclaim against RETI

68.     Counter-Plaintiffs hereby incorporate the statements and/or allegations contained in the foregoing paragraphs, as if fully set forth herein.

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL.: (213) 688-9500 – FAX: (213) 627-6342

69.     Vertucci and RETI had a valid agreement governing the payment for Vertucci's services for speaking at RETI-sponsored seminars ("speaking fees agreement"). Vertucci relied on this agreement in lieu of formal compensation by way of salary for his speaking services. Vertucci gave up other income opportunities he had, based on this agreement.

70.     RETI breached that agreement when he refused to pay Vertucci the promised amount of $1,000 per BU for speaking fees ("speaking fees agreement") and Montelongo breached that agreement when he interfered with the joint venture and caused a breach.

71.     RETI intentionally breached the speaking fees agreement for monetary reasons. Montelongo, as the President of RETI, wanted Vertucci's services without paying for them. RETI's breach of his agreements with Vertucci has proximately caused Vertucci substantial harm and damages in an amount not less than $500,000.

### Count IV – Fraudulent Inducement to Agree to Forbearance/Contract
### Counterclaim against Montelongo and RETI

72.     Counter-Plaintiffs hereby incorporate the statements and/or allegations contained in the foregoing paragraphs, as if fully set forth herein.

73.     Vertucci and RETI had a valid verbal agreement governing the payment for Vertucci's services for speaking at Montelongo's RETI-sponsored seminars ("speaking fees agreement"). That agreement is evidenced by a history of payments made to Vertucci in the amount agreed to per BU, in exchange for Vertucci being a speaker at cash-flow events. Vertucci relied on this agreement, in lieu of asking RETI for formal compensation by way of a salary or a contract of set fee for his speaking services.

74.     Montelongo, either individually or utilizing RETI as his alter ego, fraudulently induced Vertucci to agree to continue speaking at the seminars based on the promise that Montelongo would not interfere with the Vertucci-Fernandez joint

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL.: (213) 688-9500 – FAX: (213) 627-6342

1  venture. Montelongo also reminded Vertucci of the money he was receiving through

2  the joint venture as a result of having access to RETI's clients.

3      75.   When Montelongo breached that agreement relating to the speaking

4  fees, Montelongo falsely promised Vertucci that Vertucci could continue profiting

5  from the sale of the Vertucci-Fernandez NV Properties by having access to the

6  students at the RETI seminars. Furthermore, Montelongo agreed not to interfere with

7  the joint venture.

8      76.   Vertucci agreed to continue to provide speaking and mentoring

9  services for RETI's customers based on these false promises not to interfere and

10 continue providing access to the RETI clients without charging a fee based on the

11 false promises of Montelongo and/or RETI. These promises by Montelongo

12 promising were false when made or recklessly made by Montelongo without regard to

13 their truth or falsity, at the time they were made.

14     77.   Montelongo breached this agreement not to interfere with the joint

15 venture when he cause Fernandez to breach the joint venture agreement with Vertucci.

16     78.   As a result of Montelongo fraudulently inducing Vertucci to agree

17 to continue providing services without compensation in order to continue profiting

18 from the joint venture based on access to RETI's clients, Montelongo reaped the

19 benefits of the joint venture and did not have to pay for the speaking services. By

20 ultimately causing Fernandez to breach the joint venture agreement with Vertucci,

21 Montelongo was able to directly make money from the properties in the NV portfolio.

22 Montelongo continued to receive payments from the joint venture and RETI and/or

23 Montelongo did not pay Vertucci for the speaking services.

24     79.   As a result of the fraudulent inducement of his agreement with

25 Vertucci, Vertucci has been substantially harmed and damaged in an amount not less

26 than $500,000.

27

28

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL: (213) 688-9500 – FAX: (213) 627-6342

## Count V – Quantum Meruit
### Counterclaim against RETI

80.    Counter-Plaintiffs hereby incorporate the statements and/or allegations contained in the foregoing paragraphs, as if fully set forth herein.

81.    Vertucci and RETI had a valid agreement governing the payment for Vertucci's services for speaking at RETI-sponsored seminars ("speaking fees agreement"). Vertucci relied on this agreement in lieu of formal compensation by way of salary for his speaking services. Vertucci gave up other opportunities he had, based on this agreement and provided the agreed services.

82.    RETI breached that agreement when he refused to pay Vertucci the promised amount of $1,000 per BU for speaking fees ("speaking fees agreement").

83.    Alternatively, in the event that the agreement is not found to be an enforceable agreement, Counter-Plaintiffs would show that Vertucci and The Nick Vertucci Companies designed a speaking training course, with materials for RETI, and provided valuable speaking, teaching and training services to RETI.

84.    RETI accepted the valuable speaking, teaching and training services provided by Vertucci and The Nick Vertucci Companies, along with course materials.

85.    RETI had reasonable notice that Counter-Plaintiffs expected compensation for their speaking and teaching services; indeed, the reasonable value of Counter-Plaintiffs' services were already agreed to between the parties and performed – $1,000 per BU. RETI breached that agreement and did not pay Vertucci the reasonable value of the services he provided.

86.    As a result of RETI's failure to pay Counter-Plaintiffs the reasonable value of their speaking and teaching services, Counter-Plaintiffs have been harmed and damaged in an amount not less than $500,000.

### Count VI – Conspiracy
### Counterclaim against RETI and Montelongo

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL: (213) 688-9500 – FAX: (213) 627-6342

87.     Counter-Plaintiffs hereby incorporate the statements and/or allegations contained in the foregoing paragraphs, as if fully set forth herein.

88.     Montelongo, either acting individually/using RETI as his alter ego, or as an agent of RETI, was a member of a combination of two or more persons who harmed Counter-Plaintiffs.  Montelongo and RETI combined with Fernandez for an unlawful purpose, *i.e.,* to ruin Vertucci's cash-flow property business and to enrich Montelongo, at the expense of Vertucci.

89.     While Fernandez was presented with a less favorable alternative, it was the wrongful purpose of Montelongo, acting either individually or through RETI with Fernandez, to willfully and intentionally interfere with Vertucci's joint venture with Fernandez and to harm Counter-Plaintiffs financially.  Fernandez knew the wrongful purpose of Montelongo's action because Montelongo told him, but he nevertheless facilitated and/or acquiesced to the wrongful purpose.  Montelongo could not have accomplished his wrongful purpose had Fernandez disagreed with his proposed course of action and the conspiracy to eject Vertucci from and interfere with the Fernandez-Vertucci joint venture.  Montelongo told people at his company that he intended to financially harm Vertucci so he could never compete with him.  After completion of his conspiracy with Fernandez to cut Vertucci out of the joint venture for the NV Properties, Montelongo bragged to his employees and his subcontractor that he had "screwed" Vertucci, mocking him at corporate meetings by showing his face on PowerPoint presentations with captions such as "who moved my cash-flow?" and other such disparaging remarks.

90.     RETI and/or Montelongo and Fernandez committed an unlawful, overt act to further the object or course of causing significant financial harm to Vertucci to carry out their conspiracy or a lawful act through unlawful means.  The conspiracy was wrongful in that it required both Montelongo and Fernandez to breach long-standing agreements they had with Vertucci.  They knew that their actions were designed to and would harm Vertucci financially.

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL: (213) 688-9500 – FAX: (213) 627-6342

91.     As a result of the conspiracy, Counter-Plaintiffs have been harmed in an amount not less than $2 million dollars.

### Count VII – Theft of Services
### Counterclaim against Montelongo and RETI

92.     Counter-Plaintiffs hereby incorporate the statements and/or allegations contained in the foregoing paragraphs, as if fully set forth herein.

93.     Under TEX. CIV. PRAC. & REM. CODE § 134.002, *et seq.*, Counter-Plaintiffs provided valuable speaking, teaching, and training services to RETI.

94.     RETI and Montelongo knew the services were provided for compensation.

95.     RETI and Montelongo agreed to and paid the compensation for the reasonable value of the services for a period of time -- $1,000 per BU.

96.     RETI and Montelongo intended to avoid payment for the speaking and teaching services provided by the Counter-Plaintiffs by intentionally and/or knowingly securing Counter-Plaintiffs' performance of speaking services through deception and/or threat.

97.     Further, RETI and Montelongo intentionally and/or knowingly secured the performance of services by agreeing to provide other compensation to Vertucci in the form of agreed fee splits under the Vertucci-Fernandez joint venture.

98.     After the speaking and teaching services of Vertucci were rendered, RETI, through the direction and control of Montelongo, failed to pay for those services to Counter-Plaintiffs after receiving the demand for such payments.

99.     As a result of the theft of their services the Counter-Plaintiffs suffered damages in an amount not less than $500,000.

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL.: (213) 688-9500 – FAX: (213) 627-6342

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL: (213) 688-9500 – FAX: (213) 627-6342

**Count VIII – Declaratory Judgment
Counterclaim against RETI**

100.   Counter-Plaintiffs hereby incorporate the statements and/or allegations contained in the foregoing paragraphs, as if fully set forth herein.  Pursuant to California Business and Profession Code §§16600, 17200, Counter-Plaintiffs seek a declaration that the non-circumvention, or alleged non-competition provision, of the backdated Vendor Agreement is void as against public policy.

101.   Alternatively, pursuant to Chapter 37 of the TEX. CIV. PRAC. AND REM. CODE and TEX. BUS. & COM. CODE §§ 15.50 and 15.51, Counter-Plaintiffs seek a declaration that the backdated Vendor Agreement's non-circumvention, or alleged non-competition provision is a violation of Texas law as an unreasonable restraint against trade.

**Damages and Relief Requested**

102.   Counter-Plaintiffs hereby incorporate the statements and/or allegations contained in the foregoing paragraphs, as if fully set forth herein.

103.   Counter-Plaintiffs are entitled to damages resulting from the loss of the agreed $1,000 per BU for cash flow seminars between April 2012 and August 28, 2013.

104.   Counter-Plaintiffs are entitled to damages resulting from the money withheld by and under the direction of Counter-Defendants for the NV Properties for six months, including interest on the withheld sums at the legal rate, and attorneys' fees incurred by Vertucci to pursue the return of those sums.

105.   Counter-Plaintiffs are entitled to damages resulting from the loss of interest on the money Vertucci raised or borrowed to support the NV Properties' portfolio (approximately $1 million) for approximately six (6) months.

106.   Counter-Plaintiffs are entitled to damages for the reasonable value of its speaking and teaching services pursuant to TEX. CIV. PRAC. & REM. CODE § 134.005(a).

107.   Counter-Plaintiffs are entitled to damages resulting from the loss of Canadian clientele interested in purchasing property in Orlando, Florida, for which Vertucci was forced to cancel scheduled events, refund money for cancelled flights and hotels.

108.   Counter-Plaintiffs are entitled to damages owed Vertucci for the 80-100 properties in its NV Properties portfolio at the time that Vertucci was terminated, and Counter-Defendants interfered with his joint venture with Fernandez.

109.   Counter-Plaintiffs are entitled to damages for the reasonable value of sales and/or revenues from the NV Properties portfolio since approximately August 2013 or the time of the interference.

110.   Counter-Plaintiffs are entitled to damages for attorneys' fees under Chapter 38 of the TEX. CIV. PRAC. AND REM. CODE for breach of its speaking fees agreement by Montelongo and/or RETI.

111.   Alternatively, Counter-Plaintiffs are entitled to damages for attorneys' fees under Chapter 37 of the TEX. CIV. PRAC. AND REM. CODE for declaratory judgment.

112.   Alternatively, Counter-Plaintiffs are entitled to an award of attorneys' fees under TEX. BUS. & COM. CODE § 15.51(c) because the Vendor Agreement it seeks to enforce is not reasonable as to time, geographic area, and scope of activity to be restrained.

113.   Counter-Plaintiffs are entitled to such and other and further relief, at law or in equity, to which they are entitled.

**Relief Requested**

WHEREFORE, PREMISES CONSIDERED, Counter-Plaintiffs NV Properties and Vertucci respectfully request judgment from the Court as follows:

(A)   That Counter-Plaintiffs recover from RETI, its predecessors and/or Montelongo damages as a result of the breach of contract, together with attorneys' fees as provided by law;

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL.: (213) 688-9500 – FAX: (213) 627-6342

(B)   That Counter-Plaintiffs recover from RETI, its predecessors and/or Montelongo damages as a result of the interferences with contract and/or business relations;

(C)   That Counter-Plaintiffs recover from RETI, its predecessors and/or Montelongo, jointly and severally, reasonable attorneys' fees pursuant to Chapter 38 of the Texas Civil Practice & Remedies Code;

(D)   That Counter-Plaintiffs recover from RETI, its predecessors and/or Montelongo, jointly and severally, costs and reasonable and necessary attorneys' fees pursuant to Texas Civil Practice & Remedies Code §37.009 and under Title 28 U.S.C. § 2201 for declaratory judgment;

(E)   That, alternatively, Counter-Plaintiffs are entitled to an award of attorneys' fees under TEX. BUS. & COM. CODE § 15.51(c) because the Vendor Agreement it seeks to enforce is not reasonable as to time, geographic area, and scope of activity to be restrained;

(F)   That Counter-Plaintiffs recover from RETI, its predecessors and/or Montelongo, all costs of court;

(G)   That post-judgment interest be awarded on all sums awarded to Counter-Plaintiffs; and

(H)   That Counter-Plaintiffs have such other and further relief to which they may be justly entitled.

/ / /

/ / /

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL.: (213) 688-9500 – FAX: (213) 627-6342

Additionally, Counter-Plaintiffs, having answered the allegations contained in the Second Amended Complaint, and having set forth its counterclaims, respectfully prays this Honorable Court grant as follows:

(A)   That the RETI recover nothing by reason of the Second Amended Complaint.

(B)   For an order taxing the costs of this action, including a reasonable attorney fee as may be allowed at law, against RETI.

(C)   For such other and further damages and relief as to the court may seem just and proper.

Dated: November 14, 2014                    AKERMAN LLP

                                            /s/ Karen P. Ciccone
                                            Karen Palladino Ciccone
                                            Clint A. Corrie
                                            Nefertari S. Rigsby
                                            Attorneys for Defendants/Counter-
                                            Plaintiffs THE NICK VERTUCCI
                                            COMPANIES, INC. and NICK
                                            VERTUCCI

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL.: (213) 688-9500 – FAX: (213) 627-6342

# EXHIBIT A



# BUSINESS PLAN

*August 26ᵗʰ, 2012*

The following is a brief on how a short term lender can earn 10% returns on their investment per project, and up to 30% return annually when investing in multiple projects per year, by investing in our operations that have been providing turnkey real estate solutions to long term investors for the past five years.

Nick Vertucci Companies, INC.

8502 E. Chapman Ave. Suite 636

Orange, CA 92866

(800) 328-6418





EXECUTIVE SUMMARY

*The goal of NV Companies is to build traditional wealth while delivering superior returns to investors through real estate investments in select markets. We invest in fundamentally sound real estate and actively participate as a managing principal to achieve alpha returns on investments. Our investments embody a powerful combination of immediate cash flow and long-term appreciation in explosive real estate markets such as Las Vegas Nevada, and Orlando Florida. We focus on buying at the right price point, and rehabilitating properties to maximize returns. Our investments are structured to take advantage of tax deductions, to protect your assets from creditors and lawyers, and to act as an ideal retirement distribution and growth vehicle.*

*NV Companies has been providing turnkey real estate investments to individuals for over 5 years. In that time period, NV Companies has sold over 500 turnkey real estate products. Currently all of those properties are managed by teams based out of the key markets identified as the best places to invest in rental properties. Currently, over 200 of those properties are in Las Vegas, NV.*

*Clients of NV Companies are individuals who have liquid assets and are looking for ways to earn more than 1-4% on their money with traditional investment outlets such as stocks, mutual funds, or IRA's. On average, the investments provided by NV Companies yield an 8-10% annual rate of return to clients. Clients invest with NV Companies because of their knowledge of markets, proven track record of success, and because they trust in the people and the product that NV Companies has to offer.*



Objective:

To raise money from private short-term lenders who are looking to earn 10% on their capital investments per project, and up to 30% per year.

Mission:

By raising private money, NV Companies is able to quickly access funds to take advantage of the current opportunity to purchase undervalued real estate. NV Companies purchases undervalued real estate, rehabilitates the real estate, rents the real estate providing affordable housing in the current rental market, and sells this real estate at a turn-key investment to a long term real estate investor. NV Companies is currently rotating though $6-7M in capital to fund their projects. To keep up with the current demand for turnkey real estate, NV Companies is looking to raise an additional $5M in capital from multiple short-term lenders.

Keys To Success:

Finding the right capital investors to fund these projects. To define, we are looking for liquid investors who understand the current real estate market and the opportunities available and want to invest in our tried and proven model of providing turn-key rental properties to long term investors that generate cash-flow and will appreciate over time.



COMPANY SUMMARY

Company Ownership:

**Nick Vertucci** is the founder and CEO of The Nick Vertucci Companies, Inc. in Irvine, California. As a full time professional real estate investor who specializes in purchasing bank owned properties, Nick helped develop a professionally managed, "Turn-Key" investment system to assist other investors in purchasing, rehabbing and renting banked owned properties. He has extensive knowledge of and experience in developing single family homes.

Prior to his career as a professional real estate investor, Nick founded and served as President and CEO of Coastline Micro. With over 100 employees, Coastline Micro was an industry leader in providing businesses with computer systems nationwide. Although he is not currently involved in the day-to-day operations, he continues to hold ownership interest in the company. Nick travels throughout the United States as a professional trainer and mentor to both novice and veteran Real Estate Investors.

**Giovanni Fernandez** has been a full time real estate investor since attending the University of Arizona in 2001. He has invested and survived the unpredictable trends of real estate in the recent years bringing a vast amount of experience to NV Companies. Since making the Las Vegas Valley his home in 2004 Giovanni has been successfully involved in over 1500 real estate transactions including many multi-family residential projects. His skill in finding undervalued deals makes him a valuable asset. Giovanni is responsible for the acquisition of the properties and manages a majority of the renovations and property management. His keen ability to negotiate with real estate agents and our construction crews allows NV Companies to remain a competitive entity in today's marketplace.

Company Locations and Facilities:

NV Companies is based out of Orange, CA. All sales, investor strategizing and coordination of investment funding and purchases take place out of this office. Nick Vertucci and a team of professional coordinators and strategists are masters of this business.

The Property Management Locations are located in Las Vegas, NV and Orlando, FL in the centers of the best markets for rental investments. Giovanni Fernandez and his management teams oversee the field operations in both of these markets. Both locations have teams of real estate minded individuals who diligently work towards making this investment seamless for our owners. This translates into above average returns to our private money investors in short periods of time.



OPERATIONS

Acquire Real Estate:

We find the right kind of real estate in the right market, at the right price. Due to the competitive nature of the real estate market, non-traditional purchase methods have to be used to acquire high volumes of homes. NV Companies uses outlets such as Trustee sales, neighborhood stabilization programs, non-profit organizations, wholesale purchases, and bulk portfolio purchases to achieve the number of homes needed to meet our current demand.

Rehabilitate Real Estate:

NV Companies philosophy on construction is to *rehab for longevity*. When rehabilitating a home, NV Companies will upgrade HVAC, plumbing, electrical, flooring, and roofs. We will also use low maintenance landscape for the property exteriors to keep costs down for our owners.

Renting Real Estate:

NV Companies employs Leasing Specialists who are well versed in the markets where we manage properties. Leasing Specialists perform tenant screenings for each applicant before deciding to rent them at home. Our aggressive leasing specialists will typically have a home rented within 2 weeks of the available date at a rate right below market average so our rentals rent quickly and we retain tenants.

Selling Real Estate:

Exit Strategy through educational seminars, International Investment Clubs, and self-directed IRA.

Real Estate Management:

All management teams are on the ground in their market, and not managed from a distance corporate office. Each location has its own full service management solution including accounting, maintenance, leasing, marketing, and collections specialist. The management teams use a cutting edge web-based management software hosting both tenant and owner portals so both parties can access their accounts in real time.



Investor Returns and Distributions:

Because of the experience in our team, we are able to accomplish all of the operations required to sell a property within 2 months of the time of purchase. Currently there is a waiting list of investors ready to purchase these turnkey products. As soon as our product is bought, rehabbed, and rented, they are sold within days to cash buyers, or buyers with self-directed retirements accounts. It takes between 30 and 45 days for an owner to close on their investment property. At the time of closing, funds are disbursed and our private money investors receive their principal and interest. At this time, we are offering a 10% return, within a time frame of 3-4 months. You may choose to have your funds distributed directly back to you or roll your principal and interest into a new project. On average, your money can be turned 3 times per year showing you an annualized return of 30%.



## OUR PRODUCT

Here is an example of a home purchased at the Trustee Sale in Las Vegas. These documents are actual recorded documents from the purchase of the property at auction, and the sale of the property to an end investor. Also included are pictures of the property after we have rehabbed for longevity.









OUR PRODUCT (CONTINUED)

Here is another example of a property, a newer home, also purchased at auction.







MARKET ANALYSIS: LAS VEGAS, NV

NV Companies does their due diligence when identifying the best markets to invest. Las Vegas has been a perfect fit for our business model for a number of reasons. Las Vegas has been number one on the foreclosure rankings in the US. This has created a buyers' market and a huge opportunity for cash flush investors to purchase property at a discount. Many investors have been taking advantage of this opportunity since the market hit the "bottom" in '09-'10. The opportunity continues to exist in Las Vegas but inventory levels have dropped substantially due to investor demand.

### Inventory of Properties Listed for Sale

Inventory has been relatively steady around these levels in recent weeks.



When demand is high and inventory levels are dropping, naturally the median price of properties will increase. Even as the prices increase the opportunity still exists.....This market data, when presented to potential new owners, creates a buying frenzy. Buyers really understand that NOW is the time to buy.

### Median Price

Despite this week's down tic, the market seems to have plateaued around this plateau. The Market Action Index is a good leading indicator for the durability of this shift.





MARKET ANALYSIS: ORLANDO, FL

Orlando, FL has been also been a perfect fit for our business model for similar reasons. Foreclosures have been high in the Orlando Metro area and the prices of homes have fallen. This has created a buyers' market and inventory levels have dropped substantially due to high investor demand.





STRATEGY AND IMPLEMENTATION

Competitive Edge:

Our acquisition teams have been purchasing real estate in all types of markets for over 10 years. Our teams have studied and tested the best ways to purchase properties at a discount. Our teams are aggressively purchasing properties through many outlets on a daily basis. We have also built rehab teams who know our business model and are able to affordably and efficiently complete rehab jobs. The real estate market is catching fire and with so many newcomers who are trying to replicate this model, our time in the market has established our ability to stay ahead of all competition.

Marketing Strategy:

NV Companies is the Preferred Vendor for turnkey real estate solutions to students who attend Real Estate Educational Seminars. Armando Montelongo Seminars is the largest of the seminars. This outlet gives us access to over 16,000 people annually who are actively investing in real estate and are looking for more creative outlets to invest. The second largest outlet is the Millionaire Mentor Group. This is a real estate education program based out of Canada. We are exposed to over 2,000 real estate students who are specifically interested in purchasing turnkey real estate investment products. Nick Vertucci also hosts a radio show "The Real Estate Investment Hour." Listeners who tune in have the opportunity to call in to our office and strategize with one of our specialists on how to get involved with this type of investment.

Sales Strategy:

Our strategists sit down with each individual to analyze their current financial situation and make a plan for them that best suites their situation.

Historical Sales Average 32 properties/month



YOUR INVESTMENT

## LAS VEGAS INVESTMENT PROFORMA

CASH FLOW ASSUMPTIONS

|  | Unit | Portfolio |
|---|---|---|
| ACQUISITION |  |  |
| Total Units/Portfolio | 1 | 12 |
| Per Unit Purchase Price | $ 65,000 | $ 780,000 |
| Set Up / Rehab Costs | 12,000 | 144,000 |
| Acquisition Fee | 2,000 | 24,000 |
| Rehab Fee | 1,000 | 12,000 |
| Escrow / Fees / Commissions | - | - |
| TOTAL ACQUISITION COSTS | $ 80,000 | $ 960,000 |
|  |  |  |
| DISPOSITION |  |  |
| Sale Price | $ 104,900 | $ 1,258,800 |
| Less: Seminar Fees/Sales Costs | (15,000) | (180,000) |
| Less: Escrow/Fees/Commissions | (1,500) | (18,000) |
| TOTAL DISPOSITION PROCEEDS | $ 88,400 | $ 1,060,800 |
|  |  |  |
| RETURN ON INVESTMENT |  |  |
| Total Acquisiton | $ 80,000 | $ 960,000 |
| Total Disposition Proceeds | $ 88,400 | $ 1,060,800 |
| Total Net Proceeds | $ 8,400 | $ 100,800 |
| Total Return on Investment | 10.5% | 10.5% |
|  |  |  |
| Time of Investment (days) | 120 | 120 |
|  |  |  |
| Annualized Return | 31.9% | 31.9% |



MEMORANDUM
JOINT VENTURE AGREEMENT

This Agreement is entered into as of  (Month) (Day), 2012 and sets forth the basic terms of our joint venture for the acquisition, rehabilitate and flip sale by the undersigned parties (each a "Venture" and collectively the "Ventures") of selected single family property located in Las Vegas, Nevada.

1.      Parties and Name. The joint venture parties are NV Acquisition Management LLC a Nevada Corporation, ("Developer") and _____ ("Investor"). The name of the joint venture (the "Venture") shall be Vegas Portfolio.

2.      Role and Responsibilities. Investor will hold title to the property the time of acquisition. Developer shall be responsible for identifying, acquiring, rehabbing and selling the Property. Investor shall be responsible for contributing and providing equity funds for use in acquiring, repairing and carrying the Property through the date of resale, upon the term s set forth herein.

3.      Equity Funds. Investor shall contribute the sum of $ (Initial Investment)   as equity funds to be used for acquisition, repair, carrying cost and closing fees and cost related "Property").

4.      Preference Return; Allocation of Profit; Distributions.

Profits shall be allocated in accordance with their initial investment, which shall be 10% return of the initial Investment and the remainder for Developer of net profits. Once property is purchased developer will communicate the percentage return.

5       Collateral Security.  This Joint Venture agreement shall act as collateral for the funds invested.

6.      Arbitration.  Any action to enforce or interpret this Agreement or to resolve disputes between the parties or by or against any Venturer shall be settled by arbitration in accordance with the rules of the American Arbitration Association. Arbitration shall be the exclusive dispute resolution process. Any party may commence arbitration by sending a written demand for arbitration to the other parties. Such demand shall set forth the nature of the matter to be resolved by arbitration. Arbitration shall be conducted at Las Vegas, Nevada. The substantive law of the State of Nevada shall be applied by the arbitrator to the resolution of the dispute. The parties shall share equally all initial costs of arbitration. The prevailing party shall be entitled to reimbursement of attorney fees, costs, and expenses incurred in connection with the arbitration. All decisions of the arbitrator shall be final, binding, and conclusive on all parties. Judgment may be PAGE A-66.1entered upon any such decision in accordance with applicable law in any court having jurisdiction thereof.

7.      Miscellaneous.



(a)     This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(b)     This Agreement shall be construed and enforced in accordance with the internal laws of the State of Nevada. If any provision of this Agreement is determined by any court of competent jurisdiction or arbitrator to be invalid, illegal, or unenforceable to any extent, that provision shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid such invalidity, illegality, or unenforceability or, if that is not possible, such provision shall, to the extent of such invalidity, illegality, or unenforceability, be severed, and the remaining provisions of this Agreement shall remain in effect.

(c)     This Agreement shall be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

(d)     Except as provided herein, no provision of this Agreement shall be construed to limit the Ventur in any manner in the carrying on of their own respective businesses or activities.

(e)     The Venturers intend the joint venture to be a general partnership under the California Uniform Partnership Act. No Venturer shall take any action inconsistent with the express intent of the parties to this Agreement.



IN WITNESS WHEREOF, the parties have executed or caused to be executed this Agreement on the day and year first above written.

"Developer"

By: _____
Name: NV Acquisition Management LLC
Title: Managing Member
Address: P.O. Box 43111
           Las Vegas, NV 89116

E-mail: GiovanniMFernandez@Gmail.com

"Investor"

By: _____
Name: _____
Title: _____
Address: _____
         _____
E-mail: _____

By: _____
Name: _____
Title: _____
Address: _____
         _____
E-mail: _____



CONCLUSION

By investing in our business model, together with NV Companies we can fulfill the current demand for turnkey real estate investment products while earning above average returns on your short-term investment.

In the next 3-5 years NV Companies plans to continue evaluating real estate markets and trends in order to provide a turnkey real estate solution to investors. Our target audience has been consistently increasing over the past 3 years and we will continue to market and strategize with real estate education groups to continue to expand our business. The combination of years of experience, strong relationships, cutting edge methods, and technology makes NV Companies the Preferred Vendor for turnkey real estate solutions.

NV Companies is looking for short-term investors to fund our projects and keep up with current demands. Minimum investment starts at $250,000 with a minimum investment time period of 6 months.

Join in this exciting opportunity to invest with a company that is taking advantage of a once in a lifetime opportunity to provide turnkey real estate solutions in prime markets, and earn returns that you can not find anywhere else in the financial market.



**NV Acquisitions Management, LLC**
*Wiring Instructions*

Account Name:   NV Acquisitions Management, LLC

Account Number:         1882

ABA Routing #:         593

Bank Name:      Bank of America

Bank Address:    8581 West Lake Mead Blvd.

Las Vegas, NV 89128

# EXHIBIT B

Message
_____

From:        Andy Moon [andym@teamarmando.com]
Sent:        7/8/2013 11:25:24 PM
To:          Nick Vertucci [nick@nvcompanies.com]
Subject:     Re: Vendor Agreement

I need it before you go on stage or work with students. It does matter. It is short so please review tonight.

On Jul 8, 2013, at 6:13 PM, Nick Vertucci <nick@nvcompanies.com> wrote:
I don't know exactly

Again I may not have time to review and sign by bus tour but does it matter ?

Sent from my iPhone

On Jul 8, 2013, at 4:03 PM, Andy Moon <andym@teamarmando.com> wrote:
I dated it back to the beginning of the bus tours. I did not get a chance to talk to Armando about the actual start date but I assumed it was in the beginning. When did you actually start working bus tours and cash flow events?

Best Regards,
Andy Moon
*** This electronic message is confidential and is intended only for the use of the individual to whom it is addressed. The information may also be legally privileged. This transmission is sent in trust for the sole purpose of delivery to the intended recipient. If you have received this transmission in error, you are hereby notified that any use, dissemination, distribution or reproduction of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify me by electronic message or telephone and delete the message from your system.***

From: Nick Vertucci [mailto:nick@nvcompanies.com]
Sent: Monday, July 08, 2013 6:02 PM
To: Andy Moon
Subject: Re: Vendor Agreement

Bus tour is Thursday. Not really time to review. Dates back to 2010 ?

Sent from my iPhone

On Jul 8, 2013, at 3:35 PM, Andy Moon <andym@teamarmando.com> wrote:
Nick,

Attached is a vendor agreement which we have to get in place for compliance concerns by the upcoming bus tour. On top of this agreement I still need a list of all students that you have received money from for investing.



EXHIBIT
B

I need to get an agreement similar to this one for Giovanni unless he is an employee of The Nick Vertucci Companies.

Best Regards,
Andy Moon
*** This electronic message is confidential and is intended only for the use of the individual to whom it is addressed. The information may also be legally privileged. This transmission is sent in trust for the sole purpose of delivery to the intended recipient. If you have received this transmission in error, you are hereby notified that any use, dissemination, distribution or reproduction of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify me by electronic message or telephone and delete the message from your system.***

<RETI - Nick Vertucci - Vendor Agreement.pdf>

Message

| From: | Nick Vertucci [nick@nvcompanies.com] |
|---|---|
| Sent: | 7/9/2013 7:03:19 PM |
| To: | 'Giovanni Fernandez' [giovannimfernandez@gmail.com] |
| Subject: | FW: VENDOR AGREEMENT |
| Attachments: | 20130709114810845.pdf |

FYI

Its all covered in this documented email below sent to Andy.

Nick Vertucci

 NVCOMPANIES

1015 E. Chapman Ave
Orange Ca 92866
Office: (900) 328-6418
Website: www.nvcompanies.com
Email: nick@nvcompanies.com
INVEST IN YOUR FUTURE

**From:** Nick Vertucci [mailto:nick@nvcompanies.com]
**Sent:** Tuesday, July 09, 2013 11:57 AM
**To:** 'Andy Moon'
**Subject:** VENDOR AGREEMENT

Andy

I have signed and returned the vendor agreement like requested. <u>I am signing it in good faith
even though its dated Jan 2010 and I have raised money with Armandos approval which states
I cannot do so in the agreement. But again in good faith its signed and returned.</u>

<u>Will have the information you requested in regards to ALL the investors and the money we
raised and what is working now.</u> From the date we spoke two weeks ago that has not
happened and will no longer happen going forward. It is best to not rock the boat with the
current lending investors and everyone is completely happy and making a lot of money.
<u>(Humm acknowledgement they knew by requesting the information)</u>

Nick Vertucci

 NVCOMPANIES

1015 E. Chapman Ave
Orange Ca 92866
Office: (800) 328-6418
Website: www.nvcompanies.com
Email: nick@nvcompanies.com
INVEST IN YOUR FUTURE

**PROOF OF SERVICE**

I am employed in the City and County of Los Angeles, California.  I am over the age of 18 and not a party to the within action.  My business address is 725 South Figueroa Street, 38th Floor, Los Angeles, CA  90017.

On **November 14, 2014**, I served the following documents

**DEFENDANTS' SECOND AMENDED ANSWER, COUNTERCLAIMS**

on the persons below as follows:

| Attorney | Telephone/Facsimile/Email | Party |
|---|---|---|
| Joseph Wesley Huesser, II, Esq.<br>Andrew J. Moon, Esq.<br>Education Management Services, LLC<br>2935 Thousand Oaks Dr., #6-285<br>San Antonio, TX  78247 | Telephone:  210-501-0077<br>Facsimile:  210-568-4493 | Attorneys for Plaintiff<br>REAL ESTATE TRAINING INT'L, LLC |
| Jeffre D. Cawdrey, Esq.<br>Kimberly D. Howatt, Esq.<br>Gordon & Rees LLP<br>633 W. 5th Street, 52nd Floor<br>Los Angeles, CA  90017 | Telephone:  213.576.5000<br>Facsimile:  213.680.4470<br>jcawdrey@gordonrees.com<br>khowatt@gordonrees.com | Attorneys for Plaintiff<br>REAL ESTATE TRAINING INT'L, LLC |

☐ (MAIL) I placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with this firm's practice for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.  I am a resident or employed in the county where the mailing occurred.  The envelope or package was placed in the mail at Los Angeles, California.

☐ (OVERNIGHT DELIVERY) I deposited in a box or other facility regularly maintained by Federal Express , an express service carrier, or delivered to a courier or driver authorized by said express service carrier to receive documents, a true copy  of the foregoing document in sealed envelopes or packages designated by the express service carrier, addressed as stated above, with fees for overnight delivery paid or provided for.

☐ (MESSENGER SERVICE) I served the documents by placing them in an envelope or package addressed to the persons at the addresses listed and provided them to a professional messenger service for service.  A separate Personal Proof of Service provided by the professional messenger service will be filed under separate cover.

☐ (FACSIMILE) Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached.

☐ (E-MAIL or ELECTRONIC TRANSMISSION) Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☒ (CM/ECF Electronic Filing) I caused the above document(s) to be transmitted to the office(s) of the addressee(s) listed above by electronic mail at the e-mail address(es) set forth above pursuant to Fed.R.Civ.P.5(d)(1). "A Notice of Electronic Filing (NEF) is generated automatically by the ECF system upon completion of an electronic filing. The NEF, when e-mailed to the e-mail address of record in the case, shall constitute the proof of service as required by Fed.R.Civ.P.5(d)(1). A copy of the NEF shall be attached to any document served in the traditional manner upon any party appearing pro se."

☐ (State)   I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☒ (Federal)   I declare that I am employed in the office of a member of the Bar of this Court at whose direction the service was made. I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on **November 14, 2014**, at Los Angeles, California.

| Karen P. Ciccone | /s/ Karen P. Ciccone |
|---|---|
| (Type or print name) | (Signature) |

AKERMAN LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TEL: (213) 688-9500 – FAX: (213) 627-6342