AKERMAN LLP
KAREN PALLADINO CICCONE (CA SBN 143432)
Email: karen.ciccone@akerman.com
725 South Figueroa Street, 38th Floor
Los Angeles, California 90017-5433
Telephone: (213) 688-9500
Facsimile: (213) 627-6342

AKERMAN LLP
CLINT CORRIE (TX SBN 04840300)
*Admitted Pro Hac Vice*
Email: clint.corrie@akerman.com
2001 Ross Avenue, Suite 2550
Dallas, Texas 75201
Telephone: (214) 720-4300
Facsimile: (214) 981-9339

SPACH, CAPALDI & WAGGAMAN, LLP
Madison S. Spach, Jr. (CA SBN 94405)
Email: madison.spach@gmail.com
ANDREW D. TSU (CA SBN 246265)
Email: andrewtsu@gmail.com
4675 MacArthur Court, Suite 550
Newport Beach, California 92660
Telephone: (949) 852-0710 / Fax: (949) 852-0714

*Attorneys for Defendants/Counter-Plaintiffs The Nick Vertucci
Companies, Inc. and Nick Vertucci*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| REAL ESTATE TRAINING INTERNATIONAL, LLC, | Case No. SACV14-00546 AG (DFMx) |
| Plaintiff/Counter-Defendant, | Assigned to Hon. Andrew J. Guilford Courtroom 10D |
| v. | DECLARATION OF NICK VERTUCCI IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT BY PLAINTIFF/COUNTERDEFENDANT |
| THE NICK VERTUCCI COMPANIES, INC. and NICK VERTUCCI, | REAL ESTATE TRAINING INTERNATIONAL, LLC AND CROSS-DEFENDANTARMANDO MONTELONGO, JR. |
| Defendants/Counter-Plaintiffs. | |

REAL ESTATE TRAINING )
INTERNATIONAL, LLC, and ) Hearing Date: November 9, 2015
ARMANDO MONTELONGO, ) Time:   10:00 a.m.
) Crtrm.: 10D
     Counter-Defendant and )
     Cross-Defendant. )
)

I, Nick Vertucci, declare:

1.    I am a defendant and counter-plaintiff in the captioned case, and am president of The Nick Vertucci Companies, Inc., also a defendant and counter-plaintiff. I have personal knowledge of the facts set forth in this declaration, and if called on to testify to them, I could and would do so competently.

**Background and Experience**

2.    I have been involved in the real estate business since approximately 2004, when I attended real estate training seminars through National Real Estate Investors. I thereafter became part of a team for one of the largest real estate seminar companies in the country, the Enlightened Wealth Institute of Robert Allen, where I both taught at real estate seminars and also sold real estate. Soon thereafter, I began investing in real estate on my own account, and developed the investing systems I have now, specifically in residential investment properties that generated cash flow. I had a radio program through which I marketed my properties, which were located in various areas around the country, and taught seminar classes for my radio listeners.

**Formation of Relationship with Montelongo**

3.    In 2009, I began to do business with Armando Montelongo ("Montelongo"). At the time, Montelongo was offering seminars to the general public about buying and selling residential properties. I, on the other hand, by that time was doing business in a discrete subset of the residential market: buying and selling cash-flow generating properties. In other words, my business was

purchasing (usually distressed) houses, fixing them up, renting them out to tenants, and then selling them to investors as income-producing assets.

4.     At the time I met Montelongo, his seminars did not address the cash-flow segment of the market. I became friends with him, and designed and developed a seminar teaching my cash-flow technique for Montelongo's company, which was a three-day event called the "three-day cash flow event," an event the company did not previously offer, and was ultimately included in what Montelongo called the "Diamond Package." I developed the concept of a side room called the "VIP Room" for the bus tour events and my cash flow events, where my booth was set up and information on the properties was displayed, and where I sold properties as well.  I set up booths at other events as well.  That was the first time that Montelongo started offering seminars on the cash-flow segment of the real estate market, where I had by that time developed considerable expertise.

**Formation of Speaking Fees Agreement**

5.     Since the cash flow business was new to Montelongo, he asked whether I would be willing to provide teaching and speaking services at his seminars. I stated that I would not provide such services for free, but I agreed to do so for a reasonable fee. Montelongo told me that he charged each student $10,000 to attend this event, so we agreed that I would receive $1,000 out of the $10,000 fee per student for each event at which I spoke. In addition to speaking at these events, I also developed and provided materials to the students who attended the seminars. Between 2009 and June 2012, I estimate that I received at least $558,000 in speaking fees under our agreement.

**Marketing Properties to Montelongo's Students**

6.     Throughout my relationship with Montelongo, I continued operating my separate business of acquiring, rehabbing, renting, and selling cash-flow generating properties. The students who came to his seminars were ideal potential purchasers of these properties, as their attendance meant that they were interested in real estate

investing, and I thought that some of them might want a turn-key solution where they could purchase a house that was already rehabbed, rented, and generating cash flow. I therefore agreed with Montelongo that I could set up booths at his seminars to offer these properties to his students for sale. In return, I agreed to pay Montelongo a portion of the profits on each property sold.

**Formation and Operation of Joint Venture with Giovanni Fernandez**

7.    Sometime around 2007, and before I met Montelongo, I was conducting my cash flow real estate business in Detroit, and in late 2007 I began to investigate moving into the Indianapolis market. I had identified Indianapolis as a good market for the business, and began to investigate potential business partners in the area. Under my business model, when I moved into a new area, I needed someone knowledgeable about the local real estate market who was experienced in acquiring properties and running construction crews. I identified a man named Aaron Adams as someone who appeared to meet these requirements, and contacted him to see if he was interested in entering into a real estate venture with me. Adams expressed interest, and agreed to enter into the venture with me. Under our agreement, I financed, or obtained financing for, the acquisition and development costs for most of the properties, although Adams also helped obtain some financing. Adams identified properties for acquisition, managed the local construction crews who performed the rehab work, and obtained tenants for the properties.  For all intents and purposes, Adams was the "on-the-ground" manager that coordinated with my efforts to market and sell the properties, provide customer service, and to use my real estate radio show to help me find prospective purchasers. We shared the profits on each sale.

8.    In or around 2011, I began investigating the Las Vegas housing market, and believed that it represented an excellent opportunity for my cash flow business. I wanted to set up an operation in Las Vegas similar to what I had with Adams in Indianapolis, and wanted Adams to move to Las Vegas to perform the same

functions as he did in Indianapolis. To get started, though, we agreed that we needed someone in Las Vegas with knowledge of the local real estate market.

9.    At that point, Adams and I knew Giovanni Fernandez, who at the time was leading one bus (during the bus tours) for Montelongo's company. Fernandez had previously approached me about getting involved in my cash flow business. I knew that Fernandez lived in Las Vegas, where he was involved in residential real estate. Accordingly, Adams and I discussed with Fernandez forming a venture to engage in the same business in Las Vegas that Adams and I had operated in Indiana. Fernandez's role would be to supervise the construction crews rehabbing the properties and manage day to day activities until Adams moved to Las Vegas. Fernandez, Adams, and I had a number of meetings during which we explained to Fernandez how we did things and the mechanics of why we were successful, so that we could create the same system in the Las Vegas market that worked so well for us in Indianapolis.

10.    Adams, Fernandez, and I came to an agreement to operate the business. My role was the same as in Indianapolis: I would obtain financing for the acquisition and development costs, market the properties for sale, and provide customer service. Adams helped Fernandez to identify prospective properties, managed the construction crews, and provided property management services while the houses were being marketed for sale in Las Vegas.  We agreed that Fernandez would receive a portion of the funds raised for the cash-flow business of $3,000 for each property acquisition.

11.    Adams ultimately decided that he did not want to devote extensive time to the venture in Las Vegas, as he preferred to live in Indiana. He therefore withdrew from the venture, leaving Fernandez and me as the two remaining partners.

12.    Accordingly, after Adams withdrew, Fernandez and I agreed to operate the Las Vegas venture by ourselves. We agreed that I would continue to obtain

financing for the acquisition and development costs, handle customer relations, and market and sell the properties. I would be the initial contact for prospective investors and would secure an initial consulting agreement that allowed me to act on behalf of the purchasers in presenting them cash-flow properties and working with Fernandez to complete the renovations, cash-flow projections, and sales of the property.  We agreed that Fernandez would continue to identify undervalued real estate, oversee the rehabilitation work, and obtain tenants for the properties once they were ready. Fernandez also raised some financing.  In essence, the joint venture between Fernandez and I operated exactly as the joint venture I had with Adams.

13.   Fernandez and I also agreed to a sharing of the profits on each sale. We agreed that I would earn a $5,000 consulting fee when I signed up a purchaser for a particular property, and Fernandez would receive $5,000 (an increase from the $3,000 he received when he was working with Adams). We further agreed that when the property was sold, I would typically receive an additional $13,000, from the proceeds. (Sometimes I made a little less, sometimes a little more, depending upon the particular deal structure, but Fernandez always received the same amount.) We also agreed that Fernandez could keep whatever profits he made providing the construction and property management services. The business model did not contemplate losses, because the properties were not sold on the open market. Rather, an investor would agree to purchase a property at a price that permitted us to recover our costs, fees, and the return to the lender financing the acquisition and development costs.

14.   Fernandez and I jointly controlled, decided, managed and discussed with each other the various decisions we had to make in order to acquire, rehab, sell and manage our cash flow, turnkey properties. We consulted with each other, and jointly made, major decisions affecting our venture. We, including our respective staffs, spoke on an almost daily basis to discuss whatever issues arose, especially

1   about our inventory and our marketing sources, the level of sales, and our need for
2   cash to keep pace with our level of activity.

3       15.   Fernandez and I did not establish a separate company, or have a formal
4   name, for our joint venture. We loosely operated under the umbrella of "NV
5   Companies." I have a trademarked logo for a stylized depiction of my initials, NV.
6   I use "NV" in naming several of my other companies, and used the "NV" stylized
7   logo in them as well. The company from which I operated most of my business
8   activities is The Nick Vertucci Companies, which is a Nevada corporation. I own
9   all the stock of The Nick Vertucci Companies.

10      16.   Prior to the time he entered into business with me, Fernandez had his
11  own property management firm in Las Vegas. For the joint venture, Fernandez and
12  I agreed that we would form a new entity to acquire title to the properties and
13  obtain financing. Fernandez (and/or his wife, Elise Sabatino) handled the formation
14  of the entity. In order to benefit from the goodwill provided by my "NV" trademark
15  and to show consistency with the company through which I operated, NV
16  Companies, Fernandez and I agreed to name the entity "NV Acquisition
17  Management, LLC" ("NV Acquisition"), which is a Nevada limited liability
18  company. We used the stylized "NV" logo, not simply my initials, on the building
19  where the management company was located, and Fernandez often used the logo
20  on his paperwork and emails for the joint venture business, including the letterhead
21  for Fernandez's company, NV Florida Real Estate Management.

22      17.  NV Acquisition was primarily owned by Fernandez and Sabatino,
23  although he agreed that I should have an ownership interest; though we did not
24  specifically discuss the precise percentage, he designated that I would have a 9%
25  membership interest in the company. However, that percentage had nothing to do
26  with how we divided up the profits of our joint venture: that profit split was always
27  as I explained above. My 9% membership interest in NV Acquisition is evidenced

28

by an operating agreement that Fernandez and/or Sabatino prepared or had prepared, a copy of which is attached to an email as I explain below.

18. On June 8, 2012, I electronically received a cc of an email from Fernandez to Andy Moon, the in-house lawyer for Montelongo's companies. A true copy of the email and its attachments are attached as Exhibit 1 to the Defendants' Compendium of Evidence filed concurrently herewith ("Compendium"; the document was originally marked as Exhibit 59 at Moon's deposition). On October 9, 2015, I personally reviewed an electronic copy of the email and verified that the documents affixed to the email as attachments on Exhibit 1 are true copies of the attachments to that email by opening on my computer the actual email that Fernandez sent to me, which I still have, opening each attachment, and comparing those attachments to Exhibit 1. Based upon my review, I confirmed that Exhibit 1 is a true and correct copy of the June 8, 2012 email from Fernandez and all of its attachments, including the Operating Agreement.

19. At the time that I received the June 8, 2012 email, Moon was documenting Montelongo's contribution to the financing of my Las Vegas joint venture with Fernandez. As stated by the email, Moon wanted copies of the corporate documents for NV Acquisition. In response to that request, Fernandez provided Moon with the Articles of Organization for NV Acquisition, which shows that the entity was formed on February 2, 2012, and the Operating Agreement for the company. As shown by the Operating Agreement, I had a 9% interest membership interest in NV Acquisition. This was the first time that I had seen the Operating Agreement, but the fact that it contains a 9% membership interest for me is fully consistent with the discussions I had with Fernandez about the entity and the agreement we made concerning it.

20. Although Fernandez testifies in his declaration that I had no ownership interest in NV Acquisition and was never an officer, director, or employee of the company, his testimony is erroneous. I signed numerous documents and agreements

on behalf of NV Acquisition with Fernandez's knowledge and consent. For example, attached collectively as Exhibit 2 to the Compendium are true copies of what we called joint venture agreements with lenders to our venture. Pursuant to these agreements, the joint venture, through NV Acquisition, borrowed funds from third parties to be used in our acquisition and development activities. We in turn agreed to repay the principal amount of such funds, plus, depending upon the agreement, between 10-15% of the principal amount when the property acquired/developed with such funds was sold. As Exhibit 2 demonstrates, generally both Fernandez and I personally guaranteed these loans, so Fernandez saw that I was signing these agreements on behalf of NV Acquisition. (Through my business relationship with Fernandez, I saw him sign numerous documents, and became familiar with his signature. I recognize the signature above Fernandez's printed name on the Personal Guaranty attached to the financing agreement to be that of Fernandez.) Moreover, even though these financing agreements were with NV Acquisition, in several instances I signed the promissory note evidencing the loan personally.  At no time, did Fernandez ever ask me to refund any investor money for which I had signed as a management member of NV Acquisition.

21.   During our joint venture relationship, Fernandez and his wife drafted, and I reviewed and commented on, a business plan that we intended to present to potential lenders who were interested in financing the joint venture activities. Attached as Exhibit 3 to the Compendium is a true copy of a business plan that Fernandez and I developed. The business plan describes the aspects of our joint venture relationship, including that I would market and sell the properties, and Fernandez would acquire and rehabilitate them. Although the letterhead on the business plan is NV Companies, that was just a convenience we used rather than a formal name for our joint venture. In fact, when a lender agreed to provide financing, we documented the loan with an agreement to which NV Acquisition

was a party. A copy of such document is attached to the business plan. (Ex. 3, p. 13.)

22. The business plan further identifies, under the heading "Company Ownership", both myself and Fernandez. The document also describes our joint venture: to acquire, rehabilitate, rent, and sell real estate. (Ex. 3, p. 13.)

23. During the course of 2012, I began exploring other potential markets for our real estate joint venture. Fernandez and I decided that Orlando, Florida appeared to have conditions favorable to our business model, so we established operations there during 2013, and agreed that Fernandez would move there to manage the venture as he had in Las Vegas. We agreed to operate our joint venture in Orlando in precisely the same manner as we operated in Las Vegas, with Fernandez handling acquisition, renovation, and renting of the properties, while I handled financing, marketing, and sales, with both of us jointly controlling the enterprise and splitting the profits just as we had done in Las Vegas—up until the time that Montelongo caused Fernandez to terminate our joint venture agreement. Fernandez and I agreed that we would operate the joint venture in Orlando for as long as the market conditions were favorable for our business model, again just as we had done in Las Vegas.

24. As only one of numerous examples of the joint decisions Fernandez and I made for the joint venture in Orlando, on October 31, 2012, I sent Fernandez an email outlining proposed overall goals and how we would expand our joint business based on our venture for 2013 in Florida. Attached as Exhibit 4 to the Compendium is a true copy of my email, together with responses I received from Fernandez on that and the following day. For example, in my email I suggested that we buy eight houses in Florida with cash by January 2013, and three houses per month with cash for the rest of 2013; Fernandez's response was "yes we can." The email goes on to state various other goals, to which Fernandez responded with his

input. This email represents a regular process that Fernandez and I went through when we made decisions on behalf of the joint venture.

**Montelongo's Knowledge of the Joint Venture Agreement**

25.  Montelongo knew the details of my joint venture agreement with Fernandez. In fact, since Fernandez was working for Montelongo at the time I became interested in setting up the Las Vegas operation, I asked Montelongo whether he would have any objection to my entering into business with Fernandez to acquire, rehab, rent, and sell houses in Las Vegas. Montelongo was already familiar with my Indianapolis venture with Adams, as he had provided the financing for some of the property acquisitions. Montelongo said he had no objection to Fernandez's involvement in the Las Vegas venture. In fact, Montelongo was present at the initial early meeting with Adams, Fernandez and I when we discussed setting up the Las Vegas joint venture.  Montelongo actually flew to Las Vegas to meet with Fernandez before RETI began offering cash-flow properties for sale.

26.  Montelongo also obtained intimate knowledge of my joint venture with Fernandez because he personally benefited from it. Montelongo agreed that I could market the properties that Fernandez and I jointly developed for sale in Las Vegas at the seminars conducted by his company. As discussed above, in return for Montelongo's introducing his students attending these seminars to the opportunity to purchase our properties, Montelongo and I agreed that he would receive a portion of the profit on each sale. Out of my share of the proceeds of sale of each property, I paid Montelongo his share – $7,000. (Montelongo and I also jointly paid Chris Sanders, who introduced me to Montelongo, $600 for each sale on account of that introduction, so I deducted Montelongo's share of that payment, remitted the balance to him, and paid Sanders the full $600.)

27.  Montelongo also provided financing to the joint venture, and derived additional profits from doing so. Under our arrangement with Montelongo, the

venture would repay the principal amount of any loan, plus a 15% return on each property sold that had been purchased with funds he provided. This financing was evidenced by financing agreements drafted by his lawyer, Andy Moon. Attached as Exhibit 5 to the Compendium is a true copy of one such agreement that I signed. Although Montelongo never returned to us a copy signed by him, he did extend funding to the joint venture based upon this, and similar, agreements, only after we forwarded to him or his general counsel our signed copy and related guaranties. In fact Montelongo insisted that both Fernandez and I personally guarantee the return of his capital and his interest rate. Notably, I signed the agreement on behalf of NV Acquisition as its managing member, and Fernandez signed the guaranty attached to the agreement (I generally guarantied as well). (I recognize the signature above Fernandez's printed name on the Personal Guaranty attached to the financing agreement, as well as the signature on the first page of the agreement by Section 4, as those of Fernandez.) The total amount of Montelongo's loans to the joint venture exceeded $1 million.

28.    I note that in his declaration, Montelongo testified that RETI believes, and has relied upon, Fernandez's purported representations that only Fernandez and Sabatino own an interest in NV Acquisition. As shown by the email contained within Exhibit 1 to the Compendium referenced above, RETI's lawyer, Andy Moon, received from Fernandez a copy of the Operating Agreement, which shows my 9% interest. RETI further knew that I was intimately involved in NV Acquisition's operations on behalf of the joint venture, as included within Exhibit 1 is an agreement that Moon's email noted he had reviewed, which was to document a loan from a Montelongo entity to the joint venture, which was set up for my signature as managing member of NV Acquisition.

**Change in Speaking Fee Agreement**

29.    In June 2012, Montelongo announced to me that he would no longer pay my $1,000 per student speaking fee. He told me that he thought I was making

enough money from selling real estate to his students, although Montelongo also made substantial money from my activities. In order to get me to continue speaking at the cash flow seminars, Montelongo promised to me that if I spoke at the seminars without cash compensation, he would not interfere in my joint venture relationship with Fernandez and I would continue to present the venture's cash flow properties for sale in conjunction with my speaking appearances. This was of critical importance to me, because by that time I had come to know Montelongo well enough that I was concerned that at some point he might try to cut me out of the real estate venture that I had developed with Fernandez.

30.   I therefore continued, from June 2012 until Montelongo terminated the relationship on August 28, 2013, to speak at the cash flow seminars. The reason why I agreed to do so without receiving the promised $1,000 per student consideration was Montelongo's promise he would allow me to continue with my cash flow property sales and he would not interfere with my relationship with Fernandez. While part of the deal was that I would continue to have access to RETI's students to sell properties as I had for several years before then (which as I previously stated was an arrangement from which Montelongo derived considerable profits), the non-interference promise was of utmost importance, because it gave me comfort that if Montelongo should ever terminate our relationship, I could continue the joint venture with Fernandez and market the properties through other means. I had for years marketed properties through my radio shows, and sold numerous properties through that method in Detroit, Indianapolis, and California, among other places. I was confident that Fernandez and I could continue to sell properties without marketing to RETI's students if it came to that, both through radio shows and through forming new relationships with other real estate seminar companies.

**Interference with, and Destruction of, Joint Venture Agreement**

31.   Montelongo called me on August 28, 2013, when I was in Canada, and announced that he had made a decision to discontinue our business relationship. I pressed him for a reason as to why he had made that decision, and he said that he cared about two things: his three sons and money, and he would get back to me as to the order of it. He told me that I could no longer work with Fernandez because he had broken up my relationship with him. I asked him not to disrupt the relationship with Fernandez, but he said "You should know me better than that" or words to that effect. Moreover, Montelongo told me that he had told Fernandez that he was prohibited from working with me.

32.   After I spoke with Montelongo on August 28, 2013, I called Giovanni. I asked him about the various statements Montelongo had made to me. Giovanni said that Armando told him that he "is taking NV's vig," a term we used in our conversations to refer to my share of the profits. He also confirmed that Montelongo had pressured him to terminate his joint venture with me. Fernandez told me that Montelongo wanted to cut me out of the deal, and that if Fernandez would continue to do the same business with Montelongo instead of me, that Montelongo would pay him $6,000 per property sold, rather than the $5,000 under the terms of our agreement. Fernandez further told me that Montelongo stated that if Fernandez did not agree, Montelongo would terminate him and take over the real estate business, bringing it entirely in-house and cutting out Fernandez entirely. Fernandez told me that he felt he had no choice but to comply with his demand to sever ties with me and, rather than doing business with me, do the same business with Montelongo instead. He told me about (i) where the two had met (at the prior bus tour in Montelongo's hotel) regarding the meeting in which Montelongo told him what was going to happen, and (ii) when they met (before the breakout session on the fourth day). That meeting occurred before Montelongo called me.

33.   Fernandez also told me that Montelongo insisted that Fernandez not work with me at all, even on properties that would be offered to people other than RETI's students. As a result, I lost my "on the ground" person that I had used to pursue the acquisition of properties and manage the construction and remodeling crews for the rehabilitation work. Fernandez was extremely talented at what he did for the venture, and would be very difficult to replace. My participation in our business of acquiring, rehabbing, renting, and selling cash flow generating properties therefore came to an abrupt halt.  If possible, to find someone like Fernandez to work with, it takes months, if not years – not just to find, but to tweak and perfect and to get the venture running at the level of ours.

34.   At the time Fernandez terminated our relationship, I was owed over $1,000,000 on pending property sales and for financing I had extended to the joint venture. At Montelongo's insistence, Fernandez refused to release the money to me for over six months.

35.   Montelongo and Fernandez are now operating the joint venture in Orlando, using the business model I developed and implemented, in the same way that Fernandez and I did, except that Fernandez is now paid $6,000 per property sold, and Montelongo, instead of the $7,000 that I paid him (less the payment to Sanders), is making the entire gross amount that I used to make on each sale: the $5,000 up front consulting fee when a purchaser was identified and locked up, and the additional $13,000 on each sale. Although I netted slightly less than $11,000 per sale because I had to pay Montelongo $7,000 per sale, by cutting me out, Montelongo now makes the entire $18,000 per sale, plus a great deal more if he is the lender on the deal.

**Damages from Interference with Joint Venture Agreement**

36.   During 2012 and 2013 (up until the time Montelongo pressured Fernandez to cut me out of the real estate joint venture), I was making well over $150,000 per month on average from the property sales that the joint venture made

in Las Vegas and later Orlando. I also made a significant return by lending funds for the joint venture operations. Since I was cut out of my joint venture with Fernandez, Montelongo and Fernandez continued to operate the venture in the Orlando market, and are continuing to do so at this time. Expert witnesses that have been retained for me in this case will calculate the precise amount of my damages for lost profits, but I estimate that the total damages are well over $6 million.

**Breach of Speaking Fees Agreement**

37.   When Montelongo pressured Fernandez to sever ties with me and cut me out of the ongoing real estate venture, he broke his promise to me that he would not interfere with my relationship with Fernandez. In addition to the substantial damages I have suffered from losing the money I made selling the properties and lending money to the venture, I also lost the promised consideration for teaching the cash flow seminars. Moreover this agreement regarding the speaking fees of $1,000 per BU was not solely oral.  There is a long series of correspondence between myself and Mario Garcia, RETI's CFO, where I would submit the number of people (BUs) who attended cash-flow events that I taught, and Garcia would remit payment equal to $1,000 per BU to me.  Garcia made these payment on behalf of RETI.  I estimate that I taught more than 180 students at 6 seminars from the time Montelongo stopped paying me the $1,000 per student in June 2012 to the August 2013 date of termination of our business arrangement. Since Montelongo cannot undo his interference and provide me the compensation he promised for my speaking services, I believe that he, or his company, owes me at least $190,000 for past services rendered.

38.   Shortly after he stopping paying the $1000, he instructed his in-house general counsel to start making inquiries of me about the precise details of our operations, venture, and system.  In short, he wanted to inquire into how we raised our money and how we performed the work and, ultimately, the detailed

1  operational mechanics of how we worked and handled the intimate workings of our

2  venture.

3     39.  Siggi Ahrens was a former Montelongo independent contractor, who

4  now works as a speaker/close with The Nick Vertucci Companies.

5     40.  Mike  Tracey used to work for Montelongo.  He now works for the Nick

6  Vertucci Companies.

7     41.  As documented in the Second-Amended Counter-Claims, in July 2013,

8  Montelongo forced me to sign a back-dated Vendor Agreement that was back-dated

9  to January 1, 2010.  Moreover, through my conversations with Fernandez, I learned

10  that Montelongo also forced him to sign a back-dated vendor agreement as well.

11     42.  I have read and reviewed this declaration and have authorized my

12  counsel to affix my electronic signature to this declaration

13     I declare under penalty of perjury under the laws of the United States of

14  America that the foregoing is true and correct.

15     Executed on October 15, 2015.

16

17                                              /s/ Nick Vertucci
                                              _____
18                                              Nick Vertucci

19

20

21

22

23

24

25

26

27

28