# Exhibit 1

# Exhibit 1

Message
_____

| | |
|---|---|
| **From:** | Giovanni Fernandez [giovannimfernandez@gmail.com] |
| **Sent:** | 6/8/2012 10:53:41 PM |
| **To:** | Andy Moon [andym@teamarmando.com] |
| **CC:** | Nick Vertucci [nick@nvcompanies.com] |
| **Subject:** | Re: Vegas JV |
| **Attachments:** | NV Acquisition Management Docs 1.pdf; NV Acquisition Management Docs 2.pdf; NV Acquisition Management Docs 3.pdf; NV Acquisition Management LLC NV Elise and GF.pdf; RETI - Las Vegas JV - JV Agreement - Redline v1.rtf |

Andy,

   Please finda attached the corp docs, operating agreement, and JV. Please note that we will no longer require an exhibit A for the JV.

Thanks,

Giovanni

On Thu, Jun 7, 2012 at 8:01 AM, Andy Moon <andym@teamarmando.com> wrote:

Gentlemen,


Here is the JV with a few redlines, nothing substantive as I can tell.  The Excel spreadsheet is what I am hoping to use for reporting monthly on all properties bought and sold.  I want the administration to be very simple so let me know if that is doable for you all or if you have a different idea on reporting.


I will need the corporate docs on NV Acquisition Management, LLC as well.


Best Regards,

Andy Moon

*** This electronic message is confidential and is intended only for the use of the individual to whom it is addressed. The information may also be legally privileged. This transmission is sent in trust for the sole purpose of delivery to the intended recipient. If you have received this transmission in error, you are hereby notified that any use, dissemination, distribution or reproduction of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify me by electronic message or telephone and delete the message from your system.***



**Andrew J. Moon**
In-House Counsel

(210) 501-0077 Direct
(210) 568-4493 Fax
(210) 722-4669 Mobile
andym@teamarmando.com

2935 Thousand Oaks Dr. #6-285
San Antonio, TX. 78247

NVC-037001

--

**Giovanni Fernandez**

*Nevada Real Estate Management*
*7995 W. Sahara Ave Suite 101*
*Las Vegas, NV 89117*
*Cell 702.296.6945*
*Giovanni@NVREM.com*

NVC-037002



# LIMITED LIABILITY COMPANY CHARTER

I, ROSS MILLER, the Nevada Secretary of State, do hereby certify that **NV ACQUISITION MANAGEMENT  LLC** did on February 2, 2012, file in this office the Articles of Organization for a Limited Liability Company, that said Articles of Organization are now on file and of record in the office of the Nevada Secretary of State, and further, that said Articles contain all the provisions required by the laws governing Limited Liability Companies in the State of Nevada.



IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Great Seal of State, at my office on February 2, 2012.

ROSS MILLER
Secretary of State

Certified By: Electronic Filing
Certificate Number: C20120202-1139
You may verify this certificate
online at **http://www.nvsos.gov/**

NVC-037003



*050103*



**ROSS MILLER**
Secretary of State
204 North Carson Street, Suite 4
Carson City, Nevada 89701-4520
(775) 684-5708
Website: www.nvsos.gov

# Articles of Organization Limited-Liability Company
(PURSUANT TO NRS CHAPTER 86)

| Filed in the office of | Document Number |
|---|---|
| *(signature)* Ross Miller Secretary of State State of Nevada | 20120080172-23 |
| | Filing Date and Time 02/02/2012 11:31 AM |
| | Entity Number E0061672012-0 |

(This document was filed electronically.)

USE BLACK INK ONLY - DO NOT HIGHLIGHT

ABOVE SPACE IS FOR OFFICE USE ONLY

| 1. Name of Limited-Liability Company: (must contain approved limited-liability company wording; see instructions) | NV ACQUISITION MANAGEMENT  LLC | Check box if a Series Limited-Liability Company ☐ | Check box if a Restricted Limited-Liability Company ☐ |
|---|---|---|---|

| 2. Registered Agent for Service of Process: (check only one box) | ☒ Commercial Registered Agent: PAYAN & MILES, CPAS Name |
|---|---|
| | ☐ Noncommercial Registered Agent (name and address below)    **OR**    ☐ Office or Position with Entity (name and address below) |
| | Name of Noncommercial Registered Agent  OR  Name of Title of Office or Other Position with Entity |
| | Street Address _____ City _____ Nevada  Zip Code _____ |
| | Mailing Address (if different from street address) _____ City _____ Nevada  Zip Code _____ |

| 3. Dissolution Date: (optional) | Latest date upon which the company is to dissolve (if existence is not perpetual): |
|---|---|

| 4. Management: (required) | Company shall be managed by:  ☐ Manager(s)  **OR**  ☒ Member(s) (check only one box) |
|---|---|

| 5. Name and Address of each Manager or Managing Member: (attach additional page if more than 3) | 1) ELISE SABATINO Name |
|---|---|
| | 5001 NORTH CIMARRON ROAD Street Address   LAS VEGAS City   NV State   89149 Zip Code |
| | 2) _____ Name |
| | Street Address _____ City _____ State _____ Zip Code _____ |
| | 3) _____ Name |
| | Street Address _____ City _____ State _____ Zip Code _____ |

| 6. Effective Date and Time: (optional) | Effective Date: _____   Effective Time: _____ |
|---|---|

| 7. Name, Address and Signature of Organizer: (attach additional page if more than 1 organizer) | ELISE SABATINO Name | X ELISE SABATINO Organizer Signature |
|---|---|---|
| | 5001 NORTH CIMARRON ROAD Address   LAS VEGAS City   NV State   89149 Zip Code | |

| 8. Certificate of Acceptance of Appointment of Registered Agent: | I hereby accept appointment as Registered Agent for the above named Entity. |
|---|---|
| | X PAYAN & MILES, CPAS | 2/2/2012 |
| | Authorized Signature of Registered Agent or On Behalf of Registered Agent Entity | Date |

*This form must be accompanied by appropriate fees.*

Nevada Secretary of State NRS 86 DLLC Articles
Revised: 8-31-11

NVC-037004

## INITIAL LIST OF MANAGERS OR MANAGING MEMBERS AND REGISTERED AGENT AND STATE BUSINESS LICENSE APPLICATION OF:

FILE NUMBER

| NV Acquisition Management, LLC | E0061672012-0 |
| --- | --- |

NAME OF LIMITED-LIABILITY COMPANY

FOR THE FILING PERIOD OF | 2012 | TO | 2013 |

**\*\*YOU MAY FILE THIS FORM ONLINE AT www.nvsos.gov\*\***

The entity's duly appointed registered agent in the State of Nevada upon whom process can be served is:

Payan & Miles CPAs LLC
7936 W. Sahara Avenue
Las Vegas, NV 89117

\*100401\*

A FORM TO CHANGE REGISTERED AGENT INFORMATION IS FOUND AT: www.nvsos.gov

USE BLACK INK ONLY - DO NOT HIGHLIGHT                                          ABOVE SPACE IS FOR OFFICE USE ONLY

☐ Return one file stamped copy.  (If filing not accompanied by order instructions, file stamped copy will be sent to registered agent.)

*IMPORTANT: Read instructions before completing and returning this form.*

1. Print or type names and addresses, either residence or business, for all manager or managing members.  A Manager, or if none, a Managing Member of the LLC must sign the form. *FORM WILL BE RETURNED IF UNSIGNED.*
2. If there are additional managers or managing members, attach a list of them to this form.
3. Initial list fee is $125.00 .  A $75.00 penalty must be added for failure to file this form by the last day of the first month following organization date.
4. State business license fee is $200.00.  Effective 2/1/2010, $100 must be added for failure to file form by deadline.
5. Make your check payable to the Secretary of State.
6. Ordering Copies:  If requested above, one file stamped copy will be returned at no additional charge.  To receive a certified copy, enclose an additional $30.00 per certification. A copy fee of $2.00 per page is required for each additional copy generated when ordering 2 or more file stamped or certified copies.  Appropriate instructions must accompany your order.
7. Return the completed form to:  Secretary of State, 202 North Carson Street, Carson City, Nevada 89701-4201, (775) 684-5708.
8. Form must be in the possession of the Secretary of State on or before the last day of the first month following the initial registration date.  (Postmark date is not accepted as receipt date.)  Forms received after due date will be returned for additional fees and penalties.  Failure to include initial list and business license fees will result in rejection of filing.

INITIAL LIST FILING FEE: $125.00          LATE PENALTY: $75.00          BUSINESS LICENSE FEE: $200.00          LATE PENALTY: $100.00

**Complete only if applicable**

☒ Pursuant to NRS, this entity is exempt from the business license fee.     Exemption code:  003

☐ Month and year your State Business License expires:  ____  20 ____

Section 7(2) Exemption Codes
001 - Governmental Entity
002 - 501(c) Nonprofit Entity
003 - Home-based Business
005 - Motion Picture Company

| NAME | (DOCUMENT WILL BE REJECTED IF TITLE NOT INDICATED) |
| --- | --- |
| Elise Sabatino | ☐ MANAGER  ☒ MANAGING MEMBER |

| ADDRESS | CITY | STATE | ZIP CODE |
| --- | --- | --- | --- |
| 5001 N Cimarron Road | Las Vegas | NV | 89149 |

| NAME | (DOCUMENT WILL BE REJECTED IF TITLE NOT INDICATED) |
| --- | --- |
| | ☐ MANAGER  ☐ MANAGING MEMBER |

| ADDRESS | CITY | STATE | ZIP CODE |
| --- | --- | --- | --- |

| NAME | (DOCUMENT WILL BE REJECTED IF TITLE NOT INDICATED) |
| --- | --- |
| | ☐ MANAGER  ☐ MANAGING MEMBER |

| ADDRESS | CITY | STATE | ZIP CODE |
| --- | --- | --- | --- |

| NAME | (DOCUMENT WILL BE REJECTED IF TITLE NOT INDICATED) |
| --- | --- |
| | ☐ MANAGER  ☐ MANAGING MEMBER |

| ADDRESS | CITY | STATE | ZIP CODE |
| --- | --- | --- | --- |

I declare, to the best of my knowledge under penalty of perjury, that the above mentioned entity has complied with the provisions of sections 6 to 18 of AB 146 of the 2009 session of the Nevada Legislature and acknowledge that pursuant to NRS 239.330, it is a category C felony to knowingly offer any false or forged instrument for filing in the Office of the Secretary of State.

X _____
**Signature of Manager or Managing Member**

| Title | Date |
| --- | --- |
| Managing Member | |

Nevada Secretary of State Initial List ManorMem
Revised: 8-28-09

NVC-037005

**OPERATING AGREEMENT**

**OF**

**NV Acquisition Management, LLC**
**a Nevada limited-liability company**


**THIS OPERATING AGREEMENT** (the "*Agreement*") is entered into as of the <u>1st</u> day of <u>February</u>, 2012, by and among **Giovanni Fernandez LLC**, **Elise Sabatino and The Nick Vertucci Companies LLC** (collectively, the "*Members*").

## RECITALS

**WHEREAS**, the Members desire to form a limited-liability company for the purpose of operating as a Real Estate Agent.

## TERMS OF AGREEMENT

In consideration of the mutual promises contained herein, and each act to be performed hereunder, the Members (the parties hereto) agree as follows:

## ARTICLE 1.

## GENERAL PROVISIONS

1.1     <u>Formation and Name.</u>  The members hereby form a limited-liability company (the "*Company*") pursuant to Chapter 86 of the Nevada Revised Statutes (the "*Act*").  The name of the Company shall be "NV Acquisition Management LLC".

1.2     <u>Business.</u>  The business of the Company shall be to engage in any lawful activity and the specifications of a particular type of business herein shall not be deemed a limitation on the general powers of the Company.

1.3     <u>Principal Place of Business.</u>  The principal place of business and Registered Office of the Company shall be located at Las Vegas, Nevada, or at such other place within the State of Nevada as the Managers (as defined in Section 3.1) of the Company may from time to time designate.  The Company may maintain such additional offices as the Managers may determine.

1

NVC-037006

1.4     **Term.**  The existence of the Company, unless sooner terminated under the provisions of Article 9 of this Agreement, shall be ninety-nine (99) years/ perpetual from the date of the Company's formation.

## ARTICLE 2.

## DEFINITIONS

For the purposes of the Agreement, the following terms shall have the meanings set forth below:

2.1     **Capital Contribution.**  The "Capital Contribution" shall have the meaning ascribed to such term in Section 4.1 of this Agreement (valued in accordance with the principals of Section 2.3).

2.2     **Adjusted Capital Contribution.**  The "Adjusted Capital Contribution" means the excess of (i) each Member's contribution to the capital of the Company, over (ii) distributions to the Member under Article 7 (valued in accordance with the principles of Section 2.3).

2.3     **Capital Account.**  The "Capital Account" of a Member shall mean the capital account of that Member determined from the inception of the Company strictly in accordance with the rules set forth in Section 1.704-1(b)(2)(iv) of the Treasury Regulations.

Subject to the previous paragraph, "Capital Account" means:

(a)     The amount of money contributed by the Member to the Company, increased by (i) the fair market value of property contributed by the Member to the Company, if any (net of liabilities securing such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code); and (ii) the net amount of income allocated to the Member; and decreased by (iii) the amount of money distributed to the Member (excluding salaries paid for services performed as a Manager); (iv) the fair market value of property distributed to the Member, if any, by the Company (net of liabilities securing such distributed property that the Member is considered to assume or take subject to under Section 2 of the Code); (v) the Member's share of expenditures of the Company described in Section 705(a)(2)(B) of the Code (including, for this purpose, losses which are non-deductible under Section 267(a)(1) or Section 707(b) of the Code); (vi) the Member's share of amounts paid or incurred by the Company to organize the

2

NVC-037007

Company or to promote the sale of (or to sell) an interest in the Company (except to the extent properly amortizable for tax purposes); and (vii) the net amount of loss allocated to the Member.

For this purpose, "income" refers to all items of income (including all items of gain and including income exempt from tax) as properly determined for "book" purposes, and "loss" refers to all items of loss (including deductions) as properly determined for "book" purposes. "Book" income and loss shall be determined based on the value of the Company's assets as set forth on the books of the Company to the extent permitted and in accordance with the principles of Section 1.704-1(b)(2)(iv)(d), (f), and (g) of the Treasury Regulations. Otherwise, book income and loss shall be determined strictly in accordance with federal income tax principles (including rules governing depreciation and amortization), applied hypothetically based on values of Company assets as set forth on the Company books.

2.4     **Code.**   "Code" means the Internal Revenue Code of 1986, as amended, and any successor provision.

2.5     **Company Minimum Gain.**   "Company Minimum Gain" with respect to any taxable year of the Company means the Company minimum gain computed strictly in accordance with the principles of Section 1.704-2(d) of the Treasury Regulations.

Subject to the previous sentence, in general, "Company Minimum Gain" means the sum for all Company assets of the amounts of taxable income or gain that would be recognized if each asset were disposed of for the amount of Non-Recourse Liabilities secured by the asset. For this purpose, where the asset is subject to multiple secured liabilities of unequal priority, the adjusted basis of the asset shall be allocated among the liabilities in order of priority from most senior first to least senior last. Where two or more liabilities secured by a single asset are of equal priority, the asset basis shall be allocated among the liabilities pro rata in accordance with the amounts of the liabilities. For purposes of computing Company Minimum Gain, the "book" value of an asset shall be substituted for its adjusted tax basis if the two differ, but otherwise Company Minimum Gain shall be determined in accordance with federal income tax principles.

NVC-037008

2.6     **Distributable Cash.** "Distributable Cash" for any period means such portion of the cash on hand or in bank accounts of the Company which is, in the reasonable discretion of the Managers, in excess of that amount necessary (without deduction for depreciation and amortization) for anticipated obligations and contingencies including normal operating expenses, taxes, insurance, repairs, replacements, debt service, and capital improvements.

2.7     **Event of Dissolution.** An "Event of Dissolution" shall mean any event specified in Section 9.2 of this Agreement or the Act.

2.8     **GAAP.** "GAAP" means those generally accepted accounting principles and practices which are recognized as such by the American Institute of Certified Public Accountants acting through its Accounting Principles Board ("APB") or by the Financial Accounting Standards Board ("FASB") or through other appropriate Boards or Committees thereof and which are consistently applied for all periods after the date hereof to properly reflect the financial condition and the results of operations and changes in financial position of the Company, except that any accounting principle or practice required to be changed by the APB or FASB (or other appropriate Board of Committee of the said Boards) in order to continue as a GAAP or practice may be so changed.

2.9     **Member Non-Recourse Debt Minimum Gain.** "Member Non-Recourse Debt Minimum Gain" with respect to any taxable year of the Company means the Member non-recourse debt minimum gain computed strictly in accordance with Section 1.704-2(i)(2) of the Treasury Regulations (determined by substituting the word "Member" for "partner" in such regulations). In general, "Member Non-Recourse Debt Minimum Gain" is equal to the minimum gain attributable to Member Non-Recourse Liabilities.

2.10    **Member Non-Recourse Deductions.** "Member Non-Recourse Deductions" means the deductions that are treated as "partner non-recourse deductions" under Section 1.704-2(i)(2) of the Treasury Regulations.

2.11    **Member Non-Recourse Liabilities.** "Member Non-Recourse Liabilities" means liabilities of the Company to the extent that they are treated as non-recourse liabilities for purposes of Section 1001 of the Code but are not treated as non-recourse liabilities under the Treasury Regulations promulgated under

4

NVC-037009

Code Section 2 and Treasury Regulation Section 1.704-2(b)(4) because, for example, a Member (or a person related to a Member) is the creditor or the guarantor of the debt.

2.12   **Membership Percentage.**  "Membership Percentage" of each Member means the percentage of all outstanding membership interest owned by any Member as set forth in Section 4.1.

2.13   **Net Profits and Net Losses.**  The "Net Profits" and "Net "Losses" of the Company means the Net Profits and Net Losses (as described in Section 2.3 above), respectively, of the Company; provided, however, the following items shall be excluded from the computation of Net Profits and Net Losses:

      (a)      any gain or income specially allocated under Section 7.1, 7.2, and 7.6;

      (b)      any Non-Recourse Deductions; and

      (c)      any Member Non-Recourse Deductions.

For purposes of computing Net Profits and Net Losses, the "book" value of an asset shall be substituted for its adjusted tax basis if the two differ, but otherwise Net Profits and Net Losses shall be determined in accordance with federal income tax principles.

2.14   **Non-Recourse Deductions.**  "Non-Recourse Deductions" in any fiscal year means Company deductions that are characterized as "non-recourse deductions" under Section 1.704-2(c) of the Treasury Regulations.  In general, the amount of Non-Recourse Deductions for a Company taxable year will be equal to the net increase in Company Minimum Gain during the year, reduced (but not below zero) by the aggregate distributions made during the year of proceeds of a Non-Recourse Liability that are allocable to an increase in Company Minimum Gain (determined under Section 1.704-2(h) of the Treasury Regulations).

2.15   **Non-Recourse Liabilities.**  "Non-Recourse Liabilities" means liabilities of the Company treated as "non-recourse liabilities" under Section 1.2.-1(a)(2) of the Treasury Regulations.

Subject to the foregoing sentence, in general, "Non-Recourse Liabilities" means liabilities of the Company (or a portion thereof) with respect to which none of the Members bears any economic risk of loss (other than through the Member's indirect interest as a Member in the Company assets subject to the liability), as determined under Treasury Regulation Section 1.2-2.  Any liability of the Company to a Member (or to a person related to a Member -- all references in this Agreement to a person related to a

5

NVC-037010

Member means as determined under the Treasury Regulations promulgated under Section 2 of the Code for purposes of this Agreement) and any liability guaranteed by a Member (or a person related to a Member) or with respect to which a Member (or a person related to a Member) has pledged personal assets shall not be classified as a Non-Recourse Liability.

2.16    **Treasury Regulations.**  "Treasury Regulations" means the regulations of the United States Treasury Department pertaining to the income tax, as amended, and any successor provisions.

2.17    **Unit.**  "Unit" shall mean a membership interest representing a Member's proportionate share in the profits, losses, capital, and distributions of the Company subject to the terms and conditions of this Agreement.

## ARTICLE 3.

## RIGHTS, DUTIES, AND COMPENSATION OF THE MEMBERS

3.1    **Management.**  The Members shall meet at least annually and elect at least one (1) "Manager" who shall be responsible for the management of the Company's business to the best of their ability and, except as otherwise required by mandatory provisions of applicable law or this Agreement, shall have full, exclusive, and complete power and discretion to make all decisions and to do all things which they deem necessary or desirable to carry out the business of the Company.  At the annual meeting, the Members shall receive reports from the Managers.  The Managers shall serve at the pleasure of the Members until their replacements have been named as set forth in Section 3.2.

The Managers need not be Members.  The name and address of the initial Managers are as follows:

| NAME | ADDRESS |
|---|---|
| Giovanni Fernandez LLC | P.O. Box 43111 Las Vegas, NV 89116 |
| Elise Sabatino | 5001 N. Cimarron Rd Las Vegas, NV 89149 |
| The Nick Vertucci Companies Inc | 1015 E. Chapman Ave. Orange, CA 92866 |

6

NVC-037011

The Manager shall, for so long as he is capable of performing said duties, have the authority to manage the day-to-day operation of the business of the Company, including without limitation the hiring and terminating of all employees, policies and operating procedures, the leasing and the general management of all property/services of the Company.

The Manager shall, by mutual agreement, have the authority without limitation to approve the following matters:

(a)     the creation of any subsidiary of the Company (including, without limitation, a limited partnership in which the Company may serve as the sole limited partner);

(b)     any increase or reduction in the capital of the Company or of any of its subsidiaries, including, without limitation, issuing any additional Units of the Company or equity of any of its subsidiaries;

(c)     any sale, lease, transfer, or other disposition, or the entering into of any agreement or commitment to sell, lease, transfer, or otherwise dispose, of all (whether by merger, consolidation, or otherwise) or substantially all of the assets of the Company (whether in one transaction or a number of transactions);

(d)     any merger or consolidation, or the entering into of any agreement or commitment for the merger or consolidation, of the Company or of any of its subsidiaries;

(e)     any arrangement relating to the creation, refinancing, or refunding of indebtedness for borrowed money of the Company or of any of its subsidiaries;

(f)     the making by the Company, or by any of its subsidiaries, of any investment in, or the purchase or other acquisition by the Company or by any of its subsidiaries of any capital stock of or equity interest in, or of all or substantially all of the assets of, any company, partnership, or venture in existence;

(g)     the liquidation or dissolution of, or the filing for bankruptcy, reorganization or similar protection under any federal or state bankruptcy, insolvency, or similar law in respect of, the Company or any of its subsidiaries;

7

NVC-037012

(h)     all matters relating to distributions with respect to Units of the Company or equity of any of its subsidiaries (other than subsidiaries of which all of the capital is owned directly or indirectly by the Company), including the declaration or payment thereof;

(i)     any amendment, repeal, or modification of any provision of the Articles of Organization of the Company or the Articles of Incorporation or Organization or Bylaws of any of its subsidiaries;

(j)     the election and removal, with or without cause, of the Directors comprising the Board of Directors or Managers of the Company's subsidiaries (if any), and the filling of vacancies in such positions;

(k)     any substantial change in the nature of the business engaged in by the Company or any of its subsidiaries;

(l)     approval of each annual plan and budget for the Company and its subsidiaries (if any) and of any material amendment or modification thereof;

(m)     the adoption, amendment, or termination of any bonus, profit sharing, compensation, severance, termination, stock option, pension, retirement, employment, or other employee benefit agreement, trust, plan, fund, or other arrangement for the benefit or welfare of any Manager, Director, officer, or employee of the Company or of any of its subsidiaries.

3.2     **Membership Decisions.**  Except as otherwise expressly provided in Article 10, all decisions and approvals of the Members, including the election of Managers, shall require a unanimous vote of the outstanding Units held by the Members.

3.3     **Compensation For Services.**  The Managers shall be entitled to compensation for their services to the Company as follows:

(a)     Compensation to members for these responsibilities - all members have agreed that there will be no compensation to the members for performing any duties associated with such membership, including management of the LLC.  Members may be paid, however for

8

any services rendered in any other capacity for the LLC whether as an employee, independent contractor, or otherwise.

## ARTICLE 4.

### CAPITAL CONTRIBUTIONS

4.1 **Contributions to Capital of the Limited-Liability Company.** It is agreed by the members that the initial contributions to capital of **NV Acquisition Management LLC** shall be made as agreed upon by the members.

4.2 **Ownership of the Limited-Liability Company.** The ownership of the limited-liability company is as follows:

| MEMBER | TOTAL OWNERSHIP |
|---|---|
| Giovanni Fernandez LLC | 51% |
| Elise Sabatino | 40% |
| The Nick Vertucci Companies Inc | 9% |

## ARTICLE 5.

### COMPANY ACCOUNTING

5.1 **Fiscal Year:  Accounting Method.** The Company's fiscal year shall be the calendar year, or such other time period as the Managers may approve in writing.

5.2 **Company Books.**

(a) Proper and complete books of account of the Company's business shall be kept at the Company's principal place of business or such other place as the Members may agree. The books of account shall be maintained on an income tax basis, in accordance with GAAP consistently applied, and shall show all items of income and expense.

(b) Each Member at his/her sole cost and expense, shall have the right at all times during usual business hours to audit, examine, and make copies of or extracts from the Company's books of account.  Such right may be exercised through any agent or employee of such Member designated by that Member or by an independent certified

9

public accountant designated by such Member.  The Member exercising such right shall bear all expenses incurred in any such examination made on the Member's behalf.

5.3      **Bank Accounts.**  Funds of the Company shall be deposited in a Company bank account or accounts.

5.4      **Annual Report.**  Within one hundred twenty (120) days after the end of each fiscal year of the Company, the Company shall furnish to each Member an annual report.  This report shall consist of at least (i) a copy of the Company's federal income tax returns for that fiscal year, (ii) supporting income and loss statements, (iii) a balance sheet showing the Company's financial position as of the end of the fiscal year, and (iv) additional information that the Members may require for the preparation of their federal income tax returns.

## ARTICLE 6.

## DETERMINATION OF PROFITS AND LOSSES

6.1      **Determination of Net Profits and Net Losses.**  The Company's Net Profits or Net Losses for each fiscal year shall be determined as soon as practicable after the close of that fiscal year in accordance with the accounting principles employed in the preparation of the federal income tax return filed by the Company for that year, but without any special provisions for tax exempt or partially tax exempt income.

6.2      **Tax Returns.**

(a)      Unless otherwise agreed upon by the Members, the Company shall, for tax purposes, utilize the method of depreciation which will result in the greatest amount of deduction in each year.

(b)      The Company shall have prepared all tax returns, which must be filed on behalf of the Company with any taxing authority, and shall make timely filing thereof.  The cost shall be borne by the Company.  **Giovanni Fernandez LLC** is designated as the "Tax Matters Partner," as that term is defined in the Code.  The Members shall each have the right to examine any tax return prior to filing upon giving the Managers reasonable written advance notice of its intention to do so.  The Members agree that the Company shall withhold any taxes required to be so withheld under U.S. Federal Income Tax laws, and

10

NVC-037015

shall make any tax payments required to be made by the Company, under applicable law, on behalf of the Members. Further, the Members agree to provide to the Company, any information, documents, or consents reasonably required or appropriate for compliance with applicable tax laws.

## ARTICLE 7.

## ALLOCATION OF PROFITS AND LOSSES: DISTRIBUTIONS

7.1 __Company Minimum Gain Chargeback.__ Notwithstanding and provision of this Agreement to the contrary, in the event that there is a net decrease in Company Minimum Gain during any taxable year of the Company, each Member with a deficit Capital Account balance at the end of the year shall be allocated "book" income and gain for that taxable year (and, if necessary, subsequent years) in an amount equal to that Member's share of the net decrease in Company Minimum Gain (determined in accordance with Treasury Regulations Section 1.704-2(g), except to the extent that Treasury Regulations Section 1.704-2(f) provides an exception for situations where a Company Minimum Gain chargeback is inappropriate).

Allocations of income and gain pursuant to the above Company Minimum Gain chargeback shall be made as required by Section 1.704-2(f)(6) of the Treasury Regulations:

    (a)    first, from gains recognized from the disposition of Company property subject to one or more Non-Recourse Liabilities; and

    (b)    thereafter, from a pro rata portion of the Company's other items of book income and gain for the year.

"Book" income and gain shall be determined by reference to values set forth on the books of the Company in accordance with the principle of Section 2.3.

7.2 __Member Non-Recourse Debt Minimum Gain Chargeback.__ Notwithstanding any provision of this Agreement to the contrary, in the event that there is a net decrease in Member Non-Recourse Debt Minimum Gain during any taxable year of the Company, any Member having a share of that Member Non-Recourse Debt Minimum Gain (determined under Section 1.704-2(i)(5) of the Treasury Regulations) as of the beginning of the year shall be allocated items of income and gain for the year (and, if necessary, for succeeding years) equal to that Member's share of the net decrease in the Member Non-Recourse Debt

11

NVC-037016

Minimum Gain, in accordance with and except to the extent otherwise provided in Treasury Regulations Section 1.704-2(i), (4), (5), and (6).

7.3     **Repayment of capital contributions and/or loans by members**  No distributions will be made to the members until all loans and/or capital contributions made by any of the members have been repaid in their entirety.

7.4     **Distribution of Limited-Liability Company Assets or Profits.**  The distributions of the Company's assets and/or profits are to be determined and distributed according to the decisions of the managers of the Company.  Currently, Net Profits shall be allocated pro rata to each Member in proportion to their respective Membership Percentages as defined below:

| | |
|---|---|
| Giovanni Fernandez | 50% |
| Elise Sabatino | 50% |

7.5     **Allocation of Net Losses**

(a)     Net losses and Non-Recourse Deductions shall be allocated to the Members in accordance with their respective Membership Percentages.

(b)     Member Non-Recourse Deductions shall be allocated between the Members as required in Section 1.704-2(i)(1) of the Treasury Regulations in accordance with the manner in which the Member or Members bear the burden of an economic loss corresponding to the Member Non-Recourse Deductions.

7.6     **Ordering Rules.**  Notwithstanding any provision of this Agreement to the contrary, allocations of Member Non-Recourse Deductions, Non-Recourse Deductions, Company Minimum Gain and Member Non-Recourse Debt Minimum Gain shall be made before any other allocation hereunder.  To the extent permitted by applicable Treasury Regulations, such allocations and any allocations pursuant to Section 7.7 shall be made in such manner so as to reflect the underlying economic arrangement set forth in Sections 7.4 and 7.5(a).  To the extent such allocations are not permitted by applicable Treasury Regulations, subsequent allocations shall be specially made (to the extent permitted by applicable Treasury Regulations) so as to cure any discrepancy with the arrangement set forth in Sections 7.4 and 7.5(a).

12

NVC-037017

7.7    **Qualified Income Offset.**  No Net Loss shall be allocated to any Member to the extent each allocation would create or increase a deficit Capital Account balance of such Member while any other Member would have a positive Capital Account balance.  Any such Net Loss shall instead be allocated to the other Members, pro rata in accordance with their positive Capital Account balances.  Notwithstanding any provision of this Agreement to the contrary (except for Sections 7.1 and 7.2, which shall be applied first), if in any taxable year of the Company (or other period) a Member unexpectedly receives an adjustment, allocation, or distribution described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5), or (6), or any successor provision thereto, or an allocation of Net Loss that causes such Member to have a deficit Capital Account balance, such Member will be allocated items of income or gain to the extent required by Treasury Regulations Section 1.704-1(b)(2)(ii)(d).  This provision is intended to constitute a "qualified income offset" within the meaning of Treasury Regulations Section 1.704 1(b)(2)(ii)(d).

7.8    **Cash Distributions.**  Subject to Article 9 (that is, other than Distributable Cash being distributed upon the dissolution of the Company), Distributable Cash resulting from the normal business operations of the Company (as distinguished from a Capital Event) shall be distributed no less than once a year between the Members in accordance with the profit and loss allocations described in Section 7.4.

7.9    **Tax Allocations.**

(a)    To the extent that Section 704(c) of the Code, Treasury Regulations promulgated thereunder, or Code Section 704(c) principles applicable under Treasury Regulations Section 1.704-1(b)(2)(iv) require allocations of income, gain, loss, deduction, or credit to be allocated for tax purposes (as opposed to "book" purposes) in a manner different from that set forth above in this Article 7, the provisions of Code Section 704(c) and Treasury Regulations promulgated thereunder shall control such tax allocations.

(b)    In the event that the Company has taxable income that is characterized as ordinary income under the recapture provisions of the Code, each Member's distributive share of taxable gain or loss from the sale of Company assets (to the extent possible) shall include a proportionate share of this recapture income equal to that Member's prior share of prior

13

cumulative depreciation deductions with respect to the assets which gave rise to the recapture income.

7.10 **Application.** The provisions in this Article 7 shall be applied in accordance with Section 704 of the Code and the Treasury Regulations thereunder. This Article 7 shall be applied as if all distributions and allocations were made at the end of the Company's taxable year.

## ARTICLE 8.

## ADMISSION OF NEW MEMBERS

8.1 **Admission of New Members.** It is agreed between the parties that there shall be no new members admitted to **NV Acquisition Management LLC** except according to the following restrictions:

(a) In the event that a member desires to sell or transfer the rights and obligations of his or her interest, **NV Acquisition Management LLC** shall have the first right to purchase said interests. If the Company, pursuant to the voting requirements in Section 3.2, does not wish to purchase the interests of the retired member, any group or individual who is a remaining member of the Company has the right to purchase the interest. If more than one group or individuals desire to purchase the interest, the interest shall be divided between the groups or individuals in proportion to their ownership interest in the Company. In the event that neither the Company nor a member of the Company wants to purchase this interest, the interest will be transferred as the retiring member so desires. A transfer without the remaining member's two-thirds approval shall not grant to the transferee any right to participate in the management and business affairs of the Company. If two-thirds of the members approve of the transfer, the transferee will be admitted as a new member with all the rights and powers of a member and subject to all the restrictions and liabilities of a member. The transfer of a member's interest does not release the transferor from any liability he/she may have to the Company at the time of the transfer.

14

NVC-037019

## ARTICLE 9.

## DEFAULT, TERMINATION, AND DISSOLUTION OF THE COMPANY

9.1     **Events of Default.**  Each of the following shall be deemed an "Event of Default" hereunder on the part of each Member with respect to whom such event occurs:

    (a)     the violation by a Member of any of the restrictions set forth in Article 8 of this Agreement regarding the right of a Member to transfer its Membership Percentage; or

    (b)     any failure in the performance of or failure to comply with any other agreements, obligations, or undertakings on the part of the Member contained herein within thirty (30) days following notice of such default.  Upon, and only upon, the occurrence of an Event of Default, each party may exercise in equity or at law any rights it may have under this Agreement.

9.2     **Events of Dissolution.**  The Company shall be dissolved upon the earlier to occur of the following "Events of Dissolution":

    (a)     the Members vote in accordance with Section 1.4 in favor of termination and dissolution of the Company;

    (b)     substantially all of the assets of the Company are sold or otherwise transferred and the Company ceases business operations;

    (c)     the term of the Company expires; or

    (d)     upon the death, retirement, resignation, expulsion, bankruptcy, or dissolution of a Member or the occurrence of any other event which terminates his or her continued membership in the Company, unless the business of the Company is continued by the written consent of all the remaining Members.

Notwithstanding the dissolution of the Company, the business of the Company and the affairs of the Members, as such, shall continue to be governed by this Agreement until the winding up of the Company is completed.

15

NVC-037020

9.3    **Distribution of Assets.**  Upon the occurrence of an Event of Dissolution of the Company, the Members shall wind up all Company affairs, and proceed to liquidate all Company assets as promptly as is consistent with obtaining their fair value, and shall apply and distribute the proceeds in the following order:

(a)    to pay the debts and liabilities of the Company and the expenses of liquidation, in the order of priority as provided by law, and set up any reserves which the Members shall deem reasonably necessary to provide for any contingent or unforeseen liabilities or obligations of the Company, any reserves so established shall be paid over to an escrow agent, to be held in escrow for the purpose of paying such contingent or unforeseen liabilities or obligations, for so long as the Members shall deem it necessary;

(b)    to all the Members, pro rata, in accordance with their positive Capital Account balances; and

(c)    to all the Members, pro rata, in accordance with their Membership Percentage.

9.4    **Termination.**  The Company shall be terminated when (a) all property owned by the Company shall have been disposed of and (b) the net proceeds, if any, after satisfaction of liabilities to creditors, shall have been distributed among the Members.  If there are insufficient proceeds to satisfy all liabilities to creditors, the Company shall be terminated when all assets are disposed of.  The establishment of any reserves in accordance with the terms and conditions herein specified shall not extend the Term of the Company.

## ARTICLE 10.

## AMENDMENT OF AGREEMENT

10.1    This Agreement may be amended by a vote of the Members owning one hundred percent (100%) of the Units provided that such amendment shall not:

(a)    alter the interest of any Member in the profits, losses, and cash distributions without such Member's prior written consent, except upon the issuance of additional Units in exchange for Capital Contributions; or

(b)    amend Article 4 without the written approval of all Members.

NVC-037021

## ARTICLE 11.

## MISCELLANEOUS

11.1    **Notices.** Unless otherwise specified in writing, all notices, requests, demands, or other communications which any of the parties to this Agreement may desire or be required to give hereunder, shall be in writing and shall be deemed duly given (i) when delivered by hand, (ii) when three (3) business days have elapsed after its transmittal by registered or certified mail, postage prepaid, return receipt requested, or two (2) days have elapsed after its transmittal by nationally recognized air courier service. Notices shall be sent to the addresses set forth below, or another address as to which that party has given notice, in each case with a copy provided in the same manner and at the same time to the person shown below:

(a)   To the Company at:

(b)   P.O. Box 43111 Las Vegas, NV 89116

ATTN: **Giovanni Fernandez**

11.2    **Governing Law.** This Agreement is made in the State of Nevada pursuant to the provisions of the Act and shall be governed, construed, and interpreted in accordance with the laws of the State of Nevada.

11.3    **Captions.** All captions contained in this Agreement are for convenience only and shall not be deemed part of this Agreement.

11.4    **Counterparts.** This Agreement may be executed in one or more counterparts, all of which taken together shall constitute one agreement.

11.5    **Severability.** If any part of this Agreement, or the application thereof, is for any reason held invalid or unenforceable, it shall be deemed severable and the validity of the remainder of this Agreement or the applications of such provisions to other persons or circumstances shall not be affected thereby.

11.6    **Partition.** The Members hereby agree that no Member or any successor-in-interest to any Member shall have the right while this Agreement remains in effect to have the assets of the Company partitioned, or to file a complaint or institute any proceeding at law or in equity to have the property of the

17

NVC-037022

Company partitioned; and each Member, on behalf of himself or herself, his/her successors, representatives, heirs, and assigns, hereby waives any such right.  It is the intention of the Members that during the term of this Agreement, the rights of the Members and their successors-in-interest, as among themselves, shall be governed by the terms of this Agreement, and that the right of any Member or successor-in-interest to assign, transfer, sell, or otherwise dispose of his interest in the Company or any of its assets shall be subject to the limitations and restrictions of this Agreement.

11.7    **No Waiver.**  The failure of any Member to insist upon strict performance of a covenant hereunder or of any obligation hereunder, irrespective of the length of time for which such failure continues, shall not be a waiver of such Member's right to demand strict compliance in the future.  No consent or waiver, express or implied, to or of any breach or default in the performance of any obligation hereunder, shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any other obligation hereunder.

11.8    **Specific Enforcement.**  The Units of the Company are closely-held and cannot be readily sold in the open market, and harmonious relations among all Members are essential to the efficient operation of the Company.  For these reasons and others, the Members will be irreparably damaged in the event that the terms of this Agreement are not specifically enforced.  Should any dispute arise concerning the sale or disposition of any Units, an injunction may be issued restraining any sale or disposition pending the determination of the controversy.  Rights and obligations to purchase or sell any Units shall be enforceable by an equitable decree of specific enforcement.  However, such remedies shall be cumulative and not exclusive and shall be in addition to any other remedy or right which any Member or the Company may have.

18

NVC-037023

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement, as of the date first above written.

          **MEMBERS:**

          **NV Acquisition Management LLC**
          **a Nevada limited-liability company**

          ————————————————————
            **Giovanni Fernandez LLC, MEMBER**

          ————————————————————
            **Elise Sabatino, MEMBER**

          ————————————————————
            **The Nick Vertucci Companies Inc, MEMBER**

NVC-037024

**MEMORANDUM**
**JOINT VENTURE AGREEMENT**

This Agreement is entered into as of June 15, 2012 and sets forth the basic terms of our joint venture for the acquisition, rehabilitation and sale by the undersigned parties (each a "Venture" and collectively the "Ventures") of selected single family properties located in the Las Vegas, Nevada, metro area ("Property" or "Properties").

1.      Parties and Name. The joint venture parties are NV Acquisition Management LLC a Nevada Corporation. ("Developer") and RETI Properties, LLC ("Investor"). The name of the joint venture (the "Venture") shall be Vegas Portfolio.

2.      Role and Responsibilities. Developer shall acquire and hold title to the Properties in its name but on behalf of the Vegas Portfolio between the parties. Developer shall be responsible for identifying, acquiring, rehabbing and selling the Properties. Investor shall be responsible for contributing and providing equity funds for use in acquiring, repairing and carrying the Property through the date of resale, upon the terms set forth herein.

3.      Equity Funds. Investor shall contribute the sum of $500,000 ("Seed Money") as equity funds to be used for acquisition, repair, carrying cost and closing fees and cost related to "Property". Investor shall not be required to contribute more funds. A separate schedule shall be attached hereto for each property or set of properties a sample of such schedule is attached here as Exhibit "A".. As to each such property, unless acquired in the name of the "Venture", Developer & Investor agrees that it shall hold title on behalf of the "Venture"

4.      Preference Return; Allocation of Profit; Distributions.

        Distributions of cash not needed for joint venture purposes, including net sale proceeds upon resale of the Property, shall be made as follows:

        (a)     First, Seed Money shall be returned in full to Investor;

        (b)     Second, 15% of each Property as described in the schedule of properties; and

        (c)     Third, the remainder may then be paid to Developer.

        (d)     Developer and Investor may agree in writing to make alternative distributions to cover costs and expenses for either party.

5.      Collateral Security.   At the time Investor makes his contribution of equity funds, Developer shall execute and deliver to Investor, as beneficiary, a first lien deed of trust covering the Property (the "Deed of Trust") which shall be subordinate only to the senior lien in favor of Lender. The Deed of Trust shall be recorded concurrently with the deposit of equity funds by

NVC-037025

Investor with the escrow holder handling the purchase of the Property. The Deed of Trust shall secure the obligation of Developer, on behalf of the joint venture, to make distributions to Investor in return of his capital contribution amount and his share of profits.

    (a)  Developer must send an updated schedule of Properties no later than the 5th of each month to Investor.

6.    Authority; Limitations.  In furtherance of the acknowledged mutual goal of minimizing risk and accomplishing a prompt and early resale of the Property following completion of repairs, Developer's authority and discretion to make decisions with regard to resale of the Property and what price and terms to accept shall be subject to the following limitations:

    (a)  Except as otherwise provided in subparagraphs 6(b) and 6(c) below, any sale of the Property shall require the mutual consent of both Venturers.

    (b)  Unless Investor otherwise agrees, Developer shall be required to accept any offer received on or after thirty (30) days but before sixty (60) days following completion of repairs, from a qualified purchaser with no financing contingency, provided that the offered price is at least equal to 97.5% of the after repaired value of the Property as approved by Investor.

    (c)  Unless Investor otherwise agrees or a previous offer has been accepted, Developer shall be required to accept any offer received after sixty (60) days but before sixty (60) days following completion of repairs, from a qualified purchaser with no financing contingency, provided that the offered price is at least equal to or 97.5% of the after repaired value of Property as approved by Investor.

7.    Tax Accounting; Capital Account Restoration.  The parties acknowledge and agree that (a) the joint venture shall be treated as a partnership for tax purposes, and (b) for state law purposes the joint venture shall be treated as a general partnership. To the extent Developer has a negative capital account following sale of the Property and winding up of the joint venture, Developer shall be responsible for restoring its capital account. The proceeds of such contribution by Developer shall be distributed to Investor in return of a portion of its capital contributions. Developer and any other individual members or shareholders of a limited liability entity substituted by Developer shall jointly and severally agree to guarantee the obligations of Developer to contribute funds to eliminate a negative capital account.

8.    Arbitration.  Any action to enforce or interpret this Agreement or to resolve disputes between the parties or by or against any Venturer shall be settled by arbitration in accordance with the rules of the American Arbitration Association. Arbitration shall be the exclusive dispute resolution process. Any party may commence arbitration by sending a written demand for arbitration to the other parties. Such demand shall set forth the nature of the matter to be resolved by arbitration. Arbitration shall be conducted in San Antonio, Texas. The substantive law of the State of Texas shall be applied by the arbitrator to the resolution of the dispute. The parties shall share equally all initial costs of arbitration. The prevailing party shall be entitled to reimbursement of attorney fees, costs, and expenses incurred in connection with the arbitration. All decisions of the arbitrator shall be final, binding, and conclusive on all parties. Judgment may be PAGE A-66.1entered upon any such decision in accordance with applicable law in any court

NVC-037026

having jurisdiction thereof.

9.      Miscellaneous.

     (a)      This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

     (b)      This Agreement shall be construed and enforced in accordance with the internal laws of the State of Texas. If any provision of this Agreement is determined by any court of competent jurisdiction or arbitrator to be invalid, illegal, or unenforceable to any extent, that provision shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid such invalidity, illegality, or unenforceability or, if that is not possible, such provision shall, to the extent of such invalidity, illegality, or unenforceability, be severed, and the remaining provisions of this Agreement shall remain in effect.

     (c)      This Agreement shall be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

     (d)      Except as provided herein, no provision of this Agreement shall be construed to limit the Ventur in any manner in the carrying on of their own respective businesses or activities.

     (e)      No Venturer shall take any action inconsistent with the express intent of the parties to this Agreement.

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Agreement on the day and year first above written.

NV Acquisition Management LLC


By:_____

NVC-037027

Name:       Nick Vertucci
Title:      Managing Member
Address:    7995 W. Sahara Ave Ste 101
            Las Vegas, NV 89117

E-mail: GiovanniMFernandez@Gmail.com


RETI Properties, LLC


By:_____
Name:_____ Armando Montelongo Jr.
Title:      President
Address:    2935 Thousand Oaks Dr. #6-285
            San Antonio, TX 78247
E-mail:     andym@teamarmando.com

NVC-037028